[No. H031503. Sixth Dist. July 30, 2008.]

TAMER MAMOU, Plaintiff and Appellant, v.
TRENDWEST RESORTS, INC., et al., Defendants and Respondents.

COUNSEL

Duckworth Peters Lebowitz, Noah D. Lebowitz; McGuinn, Hillsman & Palefsky and John A. McGuinn for Plaintiff and Appellant.

Orrick, Herrington & Sutcliffe, Robert S. Shwarts and Erin M. Connell for Defendants and Respondents.

OPINION

**RUSHING, P. J.**—Plaintiff Tamer Mamou sued his former employer, Trendwest Resorts, Inc. (Trendwest), charging it with employment discrimination on account of his Syrian national origin and with retaliation for his resistance, as he alleged, to his supervisors' stated plans to discriminate against employees taking sick leave. Mamou also alleged that Trendwest defamed him by telling former coworkers that he had been discharged for theft and poor performance and was continuing to engage in reprehensible conduct by using misappropriated customer information to compete with Trendwest. Trendwest moved for summary judgment, relying pervasively on the premise that the decision to dismiss Mamou was made not by his immediate supervisors, who might have possessed the requisite discriminatory or retaliatory motives, but by more remote managerial officers as to whom there was no evidence of any such motive. Trendwest also contended that any defamatory statements its managers might have made were shielded by the statutory privilege for statements between persons with a common interest in the subject matter. The trial court granted the motion and entered judgment for Trendwest. We hold that this was error. The record presents triable issues of fact on the discrimination claims in view of evidence that the decision to dismiss Mamou was in fact made by his own immediate supervisor in consultation with *his* supervisor, and that the former was angered by Mamou's open resistance to his expressed desire to discriminate against workers taking medical leave, while the latter was heard to refer to the "fucking rag heads" whom the company needed to "get rid of." The record also presents triable issues with respect to the existence of the malice that will overcome a statutory privilege, as reflected in evidence from which a fact finder could reasonably infer that the authors of at least some of the defamatory statements knew they were false when made and, in one case, had vowed to "get" or "get even" with Mamou. Accordingly, we will reverse the judgment.

## I. Background

### A. Trendwest[1]

Trendwest sells vacation time-shares under the name Worldmark, The Club.[2] More precisely, Trendwest sells credits with which owners can purchase vacation packages at various resorts. It markets these credits principally through sales presentations at offices in various locations. When successful, the presentations result in the buyer's execution of a sales contract. The buyer often has a statutory right to rescind the contract within a specified period. Thus in California, if specified conditions are present, a time-share purchase contract is "voidable by the purchaser, without penalty, within seven calendar days" after specified events. (Bus. & Prof. Code, § 11238, subd. (a); see Bus. & Prof. Code, former § 11024, subd. (a), repealed by Stats. 2004, ch. 697, § 12 [three-day rescission period].) During this period the buyer is vulnerable to what one Trendwest witness called "poaching" by other sellers of credits. A secondary market exists for the resale of credits through businesses existing for that purpose. Trendwest does not participate directly in the resale market, but apparently charges a fee for processing any resulting transfers, and at least arguably benefits from the added value and reduced risk to buyers resulting from the existence of the resale market.

Trendwest operates in the western United States, Mexico, Canada, Australia, and Fiji. Its offices are administered in various regions. This case largely concerns the Northern California region, which covers somewhere between six

---

[1] Much of the following historical background depends on a declaration by a Trendwest human resources director, to which Mamou objected on the ground that his averments lacked any demonstrated foundation in personal knowledge. The declaration contains the usual recital that its contents are based upon the declarant's personal knowledge except where expressly stated otherwise. We doubt, however, that where a basis in personal knowledge does not otherwise appear, such a bald recital can satisfy the proponent's burden to affirmatively demonstrate that the witness is testifying from his own perception of the events he describes. (See Evid. Code, § 702, subd. (a) ["Against the objection of a party, such personal knowledge must be shown before the witness may testify concerning the matter."].) Further, at trial, even if such testimony were admitted over a foundational objection, it would remain open to its opponent to show on cross-examination that the witness in fact lacked personal knowledge, and to have the testimony stricken on that ground. (See *Sneed v. Marysville Gas etc. Co.* (1906) 149 Cal. 704, 707–709 [87 P. 376], cited in Cal. Law Revision Com. com., 29B pt. 2 West's Ann. Evid. Code (1995 ed.) foll. § 702, p. 300; 7 Cal. Law. Rev. Com. Rep. (1965) pp. 1, 116.) The application of these principles in the context of a dispositive motion such as summary judgment is largely unexplored territory. We need not venture deeply into it here, because the facts in question are not strictly material in themselves; they merely provide a context for the controversy at hand. We therefore set them forth without suggesting that they have been competently established for purposes of trial.

[2] Some time after the events at issue here the name used in marketing the shares was altered to Worldmark by Wyndham. This was apparently accompanied by various changes in corporate form which need not concern us now.

and 12 sales offices, including Roseville, San Jose, and Walnut Creek.[3] Trendwest sets sales and efficiency goals for each office, and a sales and budget and efficiency standard for the region. The sales operation in each office is headed by a project director. Project directors, and apparently some other employees, are or may be compensated, in whole or part through incentive and other payments apparently amounting in effect to commissions.

In 2002, Trendwest was acquired by Cendant Corporation (Cendant). In August 2003, ownership of Trendwest was transferred to a wholly owned subsidiary of Cendant Timeshare Resorts Group (CTRG), some of whose officers were involved in some of the events described below. CTRG apparently has its principal offices in Florida. Subsequent events in the entity's corporate history need not concern us here.

### B. *Mamou's Employment*

Mamou alleged, and it has not been disputed, that he is a naturalized United States citizen of Syrian birth. Trendwest hired him in 1992 as a sales representative in its Santa Clara office. Over the next five years he received a series of promotions, from assistant manager to sales manager to San Jose office project director, the top sales position in that office. In 2000 he was promoted to regional sales director for the Northern California region. In that position he oversaw six sales offices, more or less. (See fn. 3, *ante.*) He held this position until early 2003, with one complication: In February 2002 he agreed, at the request of regional vice-president of operations John Nye, to help out in the San Jose office, whose project director had just been removed. Mamou thus assumed the role of acting project director for San Jose, and apparently was classified as such for a brief period.[4] He then apparently returned to the regional director position until early 2003. At that time he left the regional director position and officially became San Jose project director

---

[3] The complexity and incomprehensibility of Trendwest's separate statement of undisputed facts (see Code Civ. Proc., § 437c, subd. (b)(1)) is vividly illustrated by two seemingly incompatible assertions offered by it on this point and accepted by Mamou as "undisputed." First Trendwest asserts that its "Northern California region includes approximately twelve sales offices . . . ." Six pages later it asserts that when Mamou was Northern California regional director, there were "approximately six sales offices in his region."

[4] According to a later Trendwest e-mail, which may or may not be admissible for this purpose at trial, Mamou was regional director of sales from October 2000 to late February 2002, when he became San Jose project director for less than five weeks before resuming the title of regional director from April 1 to the end of the year. The date of the welcome grants, described, *post*, at page 697, was May 1, 2002. Thus, while a Trendwest personnel officer later implied that the disparate treatment of Mamou with respect to welcome grants was justified by his having "spent a relatively small amount of time in the [regional director of sales] role," it appears that he occupied that position for a total of about 25 months, 18 of them before the welcome grants were issued. A finder of fact could find this a respectable tenure, especially when compared to others revealed by this record.

because, according to him, he was told that Trendwest was reducing the compensation for the regional position. He later asserted that these statements had been false and were made to induce him to leave the position, which was then filled by Larry McDowell, who Mamou believed got a materially better compensation package than had been offered to him.[5] McDowell was replaced in a few months by William Brown.

In November 2003, Kevin Fiore became regional vice-president for Northern California. He was responsible for the "development side" of Trendwest's business in the region, including sales, marketing, finance, administration, and human resources. In March of 2004, he asked Mamou to assist with the company's Walnut Creek office, which the parties agree was "struggling." Eventually it was agreed that Mamou would assume the role of project director for that office while remaining the project director in San Jose. He was to receive full compensation as Walnut Creek project director, plus a 25 percent "override and efficiency bonus" for the San Jose office. Mamou declared that they further agreed "that this arrangement would stay in place for the entirety of the Second Quarter of 2004"—meaning, under Trendwest's fiscal calendar, that the arrangement would continue through June 18.[6] Fiore, however, terminated the arrangement around mid-May when, as he testified, "[I]t wasn't working. Him running two stores, both stores were not performing at or even close to what our expectations were." Mamou testified, however, that the Walnut Creek store won a $50,000 prize for the most improvement in the company during the second quarter of 2004. Fiore denied any recollection on this point.

### C. *Regional Director Position*

In the spring of 2004, the Northern California regional director position again became vacant and Trendwest posted an opening for it. Fiore was

---

[5] Trendwest objects on hearsay grounds to Mamou's deposition testimony about McDowell's compensation. But this testimony cannot be hearsay insofar as it is offered to show Mamou's state of mind, and particularly his growing belief, as he declared, that some Trendwest managers were trying to get rid of him. Moreover he attributed his knowledge on the subject to McDowell himself, whose statements on the terms of his employment probably fall within the hearsay exception for statements by a representative of the party against whom the statements are offered. (See Evid. Code, § 1222.)

[6] Trendwest objects to this paragraph of Mamou's declaration on the ground that it "squarely contradicts his earlier sworn deposition testimony." It does not. On the cited pages of his deposition, Mamou was asked no question, and gave no testimony, concerning the duration of the agreement. He testified only about Trendwest's undertaking as to compensation, and said that this "promise" as to the amount of compensation "was in writing," i.e., a change-of-status form and in e-mail. Insofar as Trendwest's objection rests on a sort of subliminal invocation of the parol evidence rule, it is meritless, as there is no hint that either party ever intended any writing to serve as a comprehensive and exclusive expression of their agreement.

responsible for filling the position. On May 12, Mamou notified Fiore that he was interested in the position. He submitted a résumé and a skills assessment form.

On May 26, 2004, Fiore discussed the opening over lunch with Carter Lee, then the project director for an office in Federal Way, Washington. Two days later, apparently, Fiore conducted what he called an "interview" of Mamou, which he said lasted from 30 to 60 minutes. Mamou testified in deposition that there was no real job interview, but "just a visit," lasting "probably five to ten minutes max." He also described it as a "five minute brush-off interview." In an e-mail written about a month after the fact, he described it as "a 20- to 25-minutes brush-off interview . . . ." He testified that immediately after the interview he called Richard Folk, another regional director, who told him that Carter Lee had already been chosen for the position.

Trendwest asserts that Fiore only made his decision after "consulting with other senior managers" and "comparing the financial performance of the two candidates . . . ." The only evidence of consultation, however, is Fiore's testimony that he asked Ted Curtis for a recommendation and asked two other people "how is Carter as a leader." And as Mamou points out, the only evidence that Fiore examined Mamou's performance records was Fiore's testimony that he "would have" looked at such records, and the further response, when pressed, that he "believe[d]" he looked at "historical documents" of Mamou's performance in the regional position.[7] On May 31, Fiore e-mailed several Trendwest managers that he had "decided to offer the job to Carter."

---

[7] This assertion illustrates a troubling pattern under current summary judgment practice: the use of facially equivocal evidence to ground an assertion that doubtful facts are "undisputed." Here the witness was asked whether he performed an act. He was obviously in the best position to know; he might reasonably be expected to remember; and he had a strong interest in giving a flat affirmative response. Instead he indicated that he did not remember performing the act, but only believed he had. A jury might be entitled to credit this belief, but it would be equally entitled to conclude that the witness was hedging his testimony or that, though the belief might be honestly held, the very absence of a concrete memory supported an inference that the unremembered act did not occur. The testimony thus tended intrinsically to support "inferences reasonably deducible" that "contradicted" the fact asserted by Trendwest. (Code Civ. Proc., § 437c, subd. (c).) It raised a triable issue of fact on its face. It therefore could not be given the effect sought by Trendwest, which was to place upon Mamou the burden of refuting the asserted fact. This conclusion does not depend on any question of credibility, or on the court's discretionary power to deny conclusive effect to a party's averments about a fact to which he is the sole witness. (See Code Civ. Proc., § 437c, subd. (e).) Instead it recognizes the basic truth that an evidentiary datum may support two conflicting inferences *depending on how it is viewed*. The decision of how to view such a datum, in a context like the present one, is unalterably reserved to a jury. (See Cal. Const., art. I, § 16.)

Apparently about this same time, Mamou was assigned exclusively to the Walnut Creek office. Around mid-May, according to him, Trendwest stopped paying him the 25 percent incentive from the San Jose office. He asserts that this violated the agreement with Fiore under which he would receive that sum through June 18.

### D. *Medical Leaves*

Fiore acknowledged in deposition that during the period preceding Mamou's discharge he had thought "there were an excessive amount of sales employees on leaves of absence within the Northern California region." He understood that most of the leaves were medical in origin. He had a concern—he declined to characterize it as a suspicion—that there were likely people on a medical leave who were not legitimately in need of one. Later he described it as a "fear" that people were inappropriately using medical leave "as a means of taking days off." He evidently found such leaves objectionable even if an employee were truly sick: "I felt that, in comparison to my own approach to work, if I'm sick or whatever, have stress or whatever, my opinion is people should still work and I still work."

Lee testified that he too was concerned that "some of the medical leaves were suspicious . . . ."

Mamou declared that in March 2004, when Fiore and Brown asked him to "help out with the Walnut Creek sales office," the three of them "had a long discussion about the issue with employees on medical leaves of absence. Mr. Fiore was clearly very upset about the number of such leaves and specifically told me that he wanted me to help him make sure that those who were out on leave never came back; or if they did come back, that I would make their lives so miserable that they would quit. I told Mr. Fiore that I would not do that. By that time, I had already been wrongly named as a defendant in three lawsuits by former Trendwest employees and knew that if I carried out Mr. Fiore's directive, I would just be inviting more such lawsuits. Mr. Fiore was unhappy with my response to him, but we ultimately agreed that I would take over the Walnut Creek office."[8]

---

[8] Trendwest objects to these averments on the ground that they are "argument and conclusion." While some of the cited language is mildly argumentative, Trendwest's blanket objection on that ground is meritless. The statement about Fiore's mental state may have been an opinion, but if so Mamou was surely competent to give it based on his own observations. (See Evid. Code, § 800.) Trendwest also asserts that these averments are "inconsistent with Mamou's earlier sworn deposition testimony," but once again it fails to identify any deposition testimony with which they clash. It apparently seeks to dispense with that step by asserting that "no where [*sic*] in Mamou's sworn deposition testimony does he testify that prior to May 19, 2004, he opposed Fiore's alleged 'plan . . . .' " It should go without saying that a deposition witness is under no obligation to volunteer testimony; he is obliged only to answer the

There is evidence that Fiore and Lee continued to press the issue. In a June 7 e-mail to Mamou, Fiore responded as follows to the news that an employee was going on medical leave: "I know you and Carter [Lee] talked about these 'leave of absences' last week. [¶] I am disappointed that we have so many people from our region that use this as a means of taking days off. When I see people like Hoda and Bijan taking such time off, I honestly am discouraged. . . . [¶] I continue to look to you as a leader of this region. Hopefully, you find this type of stuff equally as disappointing. You continue to work your ass off to make the region better. Many of your people do as well. For us to really make substantial improvements in our performance, this type of stuff needs to come to an end. Your leadership can go a long way in ensuring that happens." In deposition, Fiore described the message as an "overreaction," an "overstatement," and an "emotional" response.

E. *Welcome Grants*

Meanwhile friction had arisen between Mamou and Trendwest over "welcome grants" of stock options that had been issued to Trendwest managers in 2002, when Trendwest was acquired by Cendant. The relative distribution of shares was determined by Trendwest's senior management, with a few "minor tweaks" by "Cendant corporate." Mamou received 8,000 shares. Every other regional director received 20,000 shares. The typical project director received about 3,000 shares.[9] On August 15, 2002, Mamou e-mailed Nye seeking his "help" to "correct[]" what he then viewed as a mistaken allocation of fewer shares to him than to other regional directors. He attributed this discrepancy to the unfortunate timing of the allocations during his "temporar[y] reclassif[ication] as a project director." "Since I was listed as Project Director and not as the [Regional] Director of Sales I became significantly harmed in the number of stock options that were given to me. [¶] I would appreciate your assistance in correcting this misunderstanding of [my] status so that I would be fairly compensated with stock options for the position that I fulfill . . . ."

---

questions put to him. His failure to testify about X has no probative value unless he was asked about X or was otherwise placed in a position where his silence constituted an implied negation of X. For such an implication to sustain a summary judgment, it would have to appear unmistakably. Trendwest has not made such a showing.

[9] Trendwest asserted as an undisputed fact that "[m]ost Project Directors were awarded approximately 3,000 shares." (Italics added.) The only evidence cited for this assertion, which Mamou contests, is the testimony of in-house Attorney John Dempsey, who stated in deposition, "It's my recollection that *the typical Project Director* received something in the neighborhood of 3,000 or 3,100 options . . . ." (Italics added.) Trendwest's proposed inference conflates the concept of *numerical majority* with that of the statistical *mode*. (See Merriam-Webster's Collegiate Dict. (10th ed. 1999) p. 702 ["majority" as "a number greater than half of a total"]; cf. *id.* at p. 747 ["mode" as "the most frequent value of a set of data"].)

Nye promptly replied, stating, "Tamer, your summary is absolutely correct. I am forwarding this to Al Schriber and will follow with a phone call early tomorrow and will do whatever I can."[10] He sent copies of this message, appending Mamou's original message, to Schriber and another senior manager.

So far as the record shows, there was no further communication on the subject until December 13, 2003. On that date, Mamou forwarded to Fiore and Brown a copy of his e-mail exchange with Nye, accompanied by the note, "hi bill can you or kevin help me with this ??????" Fiore forwarded the message to Nye, asking "what was done to fix it?" and "does H[uman] R[esources] know about this?" Nye replied tentatively that "Al S." may have "made appropriate changes to pay," but that "[i]t look[ed]" as if "Al" might not have "record[ed] title changes and the subsequent stock shortfall." He noted that in a similar situation elsewhere "we were unable to correct after the fact." By way of possible solutions, he wrote, "My direction would be to work with HR who should have changes on file. . . . It is my plan to adjust if we have stock program in 04' [sic]." On January 2, 2004, Fiore forwarded the entire message thread to human resources vice-president Jan Cannon asking, "Do you have any recollection of this? It seems like a deal was reached with Al based on the John Nye correspondence. If so, it sounds like Tamer should have been given some options. [¶] Is this true?" Cannon replied, "No[11] but I will research it and get back to you. [I]nteresting he waits this long to surface again. [M]ust be that old stock price going up thing. I am out of the office until February 12 [i.e., 40 days later] but will see what I can find out for you."

On January 13, Fiore e-mailed Mamou that he had "researched this issue with everyone involved, except Duke. Apparently, the number of options you received was considered at the Corporate level by Al and Jan. The consideration given included discussions with John Nye, Duke, and the Corporate Administration group. They felt the options distributed were appropriate. Based on my research it seems that you were given more than a normal P[roject] D[irector] but less than a sales director. As such, there will be no change to the number distributed."

On April 26, 2004, Mamou spoke to sales vice-president Michael Feorene about the welcome grants. On April 27, he sent Feorene a copy of his original

[10] Indeed, so prompt was Nye's reply that it is time-stamped the day before the message to which it responds—16 hours earlier, to be precise. The parties do not discuss this anomaly, which might signify a misconfigured computer or, conceivably, Mamou's presence on the western side of the international date line.

[11] Although there is no way to be certain, Cannon's "No" was presumably in response to "Do you have any recollection of this?" rather than to "Is this true?," a question to which there is no evidence he then knew the answer.

e-mail exchange with John Nye. Feorene forwarded this to Cannon saying, "Tamer spoke to me about this on the 26th of this month. Seems to be 2 years old. Your thoughts?" Cannon replied, "We thought we closed this door a long time ago. Whether Tamar [*sic*] was a P[roject] D[irector] or a D[irector] O[f] S[ales] does not matter. Both positions are at the S[ales] M[anager] level and have the same band. More or less shares were given based on the manager's perception of the employee's contribution. He just doesn't seem to understand the program or chooses not to. He has contacted just about everyone in the company about this. Sometimes no just means no."

On May 14, 2004, apparently invoking Trendwest's avowed "open door policy," Mamou e-mailed Don Harrill, the president of Trendwest, and Lauren DeSimon Johnson, CTRG's vice-president of human resources, with copies to various other persons. He again summarized the history of the welcome grants issue, continuing to characterize the allocation as a "mistake" that then managers "promised . . . would be corrected," and asserting that by any objective criterion he had not gotten his "fair share of stock options." Johnson replied that she would discuss the issue with appropriate parties and respond to Mamou shortly. Apparently the inquiry was again referred to Cannon, whose e-mails from the outset could be found to betray a certain impatience with Mamou's concerns. On May 24, Cannon wrote to Johnson that Mamou "spent a relative small amount of time in the [regional director of sales] role. His award was not a mistake. He has been a problem off and on during his tenure here."

Trendwest again refused to issue additional shares to Mamou. However, Fiore lobbied other members of management to assuage Mamou's concerns by allowing him some kind of compensation. This led to a decision to offer Mamou $15,000 in cash and $35,000 in options, the latter to vest in six to 12 months. Trendwest characterized the offer as "contingent on Mamou's complete support in improving the Walnut Creek store and long-term commitment to the company." According to Mamou, it was contingent on his "pledging to support the unlawful activities of Mr. Fiore and Mr. Lee in regard to the treatment of Trendwest employees who had exercised their right to take medical leave of absences . . . ." The offer was conveyed by Fiore and Lee on June 14, 2004, in a meeting Mamou later described as three hours of "finger-pointing, arm-twisting tactics, and wrongful accusations." He testified that at the outset of the meeting, Lee told him, " 'Look, Tamer, . . . [w]e know you got F'd [*sic*]—okay?—but we cannot un-F you, okay?' He said, 'Now there's a lot of issues that we're going to discuss, okay?' And then he went—they went on the attack of me undermining them and not being supportive and playing by their rules—okay?—and he says, 'We're going to make you an offer today, and you have—' I believe they gave me 24 hours or 48 hours to consider on—on the offer. . . . [B]ut he says, 'Before we even get there, here's stuff we want taken care of,' and they went down the list—

okay?—of the stuff that I'm supposed to do or not to do or say or not to say. . . ." Mamou told them that there were some management activities of which he "wouldn't want to be supportive." Among these was "them wanting to fire everybody who's on medical leave or never even promote them."

Mamou testified that during this meeting he also brought up his own suspicion that Trendwest was "planning to get rid of me." He alluded to "David, the cleaner, who was hired, who came in to the Roseville office, and he promised to get rid of the Middle Eastern regime, and he be coming to Walnut Creek to take care of me, get me blown out." He said, "Here's, here's a guy who comes from outside of the company, walks into a sales office . . . claims that he—that Bill Brown was booted out of the company like a football, and he's—next week he's going to Walnut Creek. He's going to take care of Tamer Mamou, and that Middle Eastern regime is going to be gone." Further, he queried, if Trendwest were not trying to get rid of him, "why did they not give me the stock options . . . . They awarded stock options to everybody else in the region. I was the only one that wasn't awarded."

Mamou did not accept the offer. On June 16, 2004, he sent an e-mail to Cendant vice chairman Steve Holmes, CTRG president Jack McConnell, and Cendant chairman and CEO Henry Silverman. In doing so, he testified, he was "taking advantage of the open-door policy" and relying on assurances that "there would not be a problem" so long as he was "going through the chain of command." Apparently to show compliance with this condition, he incorporated in the message copies of earlier messages he had sent and received on the subject. In the new message, he complained that the welcome grant issue remained unresolved after two years, and added, "I believe a thorough investigation would clearly indicate that I was discriminated against." He also referred to a promise by Fiore that "there would be absolutely no retaliation or repercussions if I were to take this issue to the Cendant Timeshare level in Orlando." However, he wrote, "ever since I sent an email requesting justice, and for the company to honor all their promises, things have deteriorated." He then listed five "examples," beginning with the awarding of the regional director position to Lee "even prior to my interview," despite what Mamou believed were Lee's inferior qualifications. He wrote that "another form of retaliation, intimidation and harassment" appeared in the conduct of "the Cleaner, David," who "was sent to the region supposedly to clean house." On June 2, 2004, he wrote, "David reported to Roseville Office. First David makes a statement that 'Bill Brown was "booted" out of the company like a football'. He makes a threat that . . . he will be going to Walnut Creek Office to handle Tamer Mamou and to straighten out Walnut Creek Office." Mamou went on to detail unseemly conduct by "David" toward or with other Trendwest employees, and then wrote that when he reported this to Lee, he was "perceived as undermining management and not supporting David." Mamou then turned to a June 10

meeting in Walnut Creek, at which Lee made a number of comments Mamou found objectionable because of profane, homophobic, or otherwise offensive content. Among these was a request by Lee that project directors "send him an e-mail with a list of all those on medical leave, and that he wanted to know the [project directors'] opinion as to which ones were legit and which were not, so they could be terminated or denied future promotions."

In this e-mail, Mamou characterized Trendwest's offer as a "bribe" because of the conditions attached to it, and an "ultimatum" because he was "given a 24-hour window to make up my mind," after which the offer would be "off the table." He wrote that Lee and Fiore "surprised" him at the meeting by raising the possibility that he might "accept their offer of $50,000 and then end up leaving the company . . . ." "I am happy, committed and love my job," he wrote. "However, I told Kevin that they should not expect me to be a follower and a supporter of such behaviors as: [¶] 1. Double standards when it comes to compensation. [¶] 2. Double standards when it comes to hiring and promoting. [¶] 3. Behaviors such as Carter[']s during the June 10th meeting. [¶] 4. Behaviors such as David's (the cleaner) in Roseville."

Mamou went on to identify a number of questions that he felt should be addressed in any investigation of his charges. These included: "Is it true that Tamer applied for the Regional Director of Sales and he was promised interviews with Kevin, Michael, and Ted, yet the interviews never took place??? Why didn't Michael and Ted interview Tamer? Can that be explained? [¶] . . . Is it true that Tamer's interview with Kevin on the 28th of May was actually after Carter Lee had been selected for the position?" Other questions alluded to Mamou's arguably superior qualifications and his willingness to take the position "with a straight commission based on performance," whereas "Carter Lee was given a guaranteed salary."

On June 17, this e-mail became the topic of a conference call among Holmes, Johnson, Harrill, and two in-house attorneys. The result was a decision to modify the offer to Mamou by making it all cash—$15,000 up front, and $35,000 after an additional year in service. The offer was to be conditioned on Mamou's execution of a general release.[12] Trendwest asserts that the offer was made because Mamou was a valued employee who had "lost focus" over the welcome grants.

Harrill sent Fiore a set of "talking points," authored by Johnson and Cendant house counsel John Dempsey, to use in communicating the new offer to Mamou. Fiore, accompanied by director of human resources Michael

---

[12] Mamou described this point as disputed, but then proceeded to acknowledge that the conferees agreed that "any further offer made to Mr. Mamou would have to contain a release of all claims against the company."

Meic, presented the offer on June 19, 2004. Fiore also told Mamou that Trendwest was going to investigate the other issues raised in his June 16 message.

Mamou rejected this offer. On June 20, 2004, he sent an e-mail to Fiore, with copies to senior managers and in-house attorneys, recounting the June 19 meeting and explaining his refusal of the offer, which he had apparently communicated to Fiore and Meic at that time. He wrote that "[n]one of the discrimination or retaliation issues were discussed or addressed," and that his response to the offer "was the same as that of last Monday, that I decline and that I cannot accept anything less than the equivalent of the actual real value of the stocks as if I were to exercise my options today." He recounted Fiore's statement that "[Steve] Holmes and [Henry] Silverman elected not to get involved with this situation due to the fact that they get hundreds of e-mails a day," and concluded that if this were "the company's final resolution to everything that I listed in my email, I would appreciate a written notification to that [effect.] I will then have no choice but to seek legal advice."[13]

On June 21, Holmes called Mamou. Mamou testified that the conversation took about an hour. According to him, Holmes corroborated what was then Mamou's understanding about the original stock allocation, which was that " '[I]t was an error,' " in that it was based on "the title that the employee held," and " '[S]omebody from Trendwest made the mistake [of] listing you as project director.' " Holmes asserted, however, that it was impossible under the securities laws to issue options retroactive to a specific date, so there had to be a different way of providing fair compensation. With respect to the other issues raised by Mamou, Holmes said that "they were extremely serious," that he "took them to heart," but that there were "too many" to work through, and so Trendwest was sending Johnson to lead an investigation into Mamou's charges of wrongdoing. Holmes added that it would take Johnson a week or 10 days to get to California to undertake the investigation. Mamou "told him that, if they deliver based on the threats and the promises and the discrimination, all these issues[,] based on that, I'm almost out the door. I'm making plans to move on. I really don't want to. If justice is served, then I'll

---

[13] Trendwest makes much of the fact that Meic eventually conducted an investigation of Mamou's allegations about Lee, and that Lee was thereafter subjected to what Trendwest characterized as disciplinary actions. No indication is given of the timing of these events. Meic declared only that "[s]hortly after" Mamou's e-mail of June 20, 2004, "Trendwest's legal department asked me to conduct an investigation," which he did at some unspecified but necessarily later date. Since the decision to fire Mamou occurred no later than June 23, this evasive averment is pregnant with the inference that the investigation was commenced in anticipation of litigation. Evidence of it, and Trendwest's consequent actions, may be evaluated by a jury for what it is worth, but can have no tendency to support entry of summary judgment.

be totally fine, and I'd like to continue on with my career . . . ." Holmes "assured me—he asked me to—not to do anything." Mamou also told him of "my understanding" that "they['re] going to terminate me the next day." Holmes gave him "his word that they won't do a termination until [Johnson] can conclude her determination." Mamou proposed that upon conclusion of the investigation, if any of his charges were shown to be unsupported, or "if there's one thing I'm in violation of, I'll—I'll walk away, no hard feelings."

Holmes's account of the conversation differed in some respects from Mamou's. In a contemporaneous e-mailed summary, Holmes wrote that while Mamou continually referred to the proposed payment as a " 'bribe,' " Holmes "stopped him three times to tell him it was a payment to correct what he perceived as an underpayment in the welcome grant and that my view is that he is owed zero, but in the interest of keeping him focused on his business we were willing to make the proposal that Kevin gave him. I told him that Kevin is 100% the person t[o] handle those discussions. Tamer said he was really confused by Kevin making the offer, since he felt that Kevin was to a degree involved in some of the problems in the offices . . . . I told him he was confusing a couple of issues . . . Kevin was talking to Tamer about settling the question surrounding the stock options and a separate investigation led by [Johnson] would look into his other issues. Tamer said that the settlement with Kevin would have meant that he would never be able to call or e-mail Cendant people again or speak out if he saw things that were wrong within Trendwest—'It is not worth $50,000 for him to lose his right to speak freely.' " (Second ellipsis in original.)

Holmes reported that Mamou appeared "surprised that I called and at one point got so emotional that he had to take a couple of deep breaths and we had to take a bit of a break. His emotion (or good acting if I were cynical) relates to what he considers a series of very unprofessional and inappropriate behaviors by the Trendwest management group." Mamou "continually said that he wanted to stay with the company and be a high performer again. He said that he is fiercely loyal and willing to speak out at injustice—and that these characteristics are being viewed as threatening to many of the new management." Mamou "said that [Lee] is telling a bunch of people that he, [Lee], is being sent to Walnut Creek to 'clean out those that are loyal to Mamou or Brown.' " "The way I left it," Holmes concluded, "was for him to discuss the settlement with Kevin but recognize that it would require some sort of release because it would be irresponsible for us to make a payment without one. And that [Johnson] would probably be contacting him relative to her investigation into other matters."

### F. *Attempt to Form Resale Corporation*

Meanwhile, on or shortly after May 19, 2004, Mamou had submitted for filing by the California Secretary of State a set of proposed articles of incorporation accompanied by his personal check for the filing fee. The proposed articles are not included in the present record, but it appears that the proposed corporation was to be named "WorldMark Heaven, Inc." and its proposed business was identified as "Rental and Resale of Timeshare." Mamou testified that he sought to form the corporation not out of a fixed intention to operate it, but because he had decided "that I should have a Plan B" in the event that his position with Trendwest continued to deteriorate. He declared that during the preceding half-year, "the old guard of Trendwest management was steadily being terminated . . . ." About the same time, he began to notice what he perceived as adverse actions against him by Fiore. Thus in April 2004, Fiore stopped reimbursing him for certain out-of-pocket expenses Mamou had incurred on Trendwest's behalf. Fiore also failed to fulfill a promise he had made to supplement Mamou's compensation on account of time he was forced to spend away from productive work assisting in the defense of lawsuits brought against Trendwest by three former employees. Trendwest also failed to reimburse certain out-of-pocket expenses incurred by Mamou in connection with those suits, and claimed by him in expense sheets. In mid-May of 2004, Fiore "suddenly" stopped paying Mamou the 25 percent share of San Jose "overrides" and efficiency bonuses that Fiore had agreed to pay through June 18 as an inducement to Mamou's acting as project director for the Walnut Creek office.

By the spring of 2004, Mamou declared, he had become "very worried that my time with Trendwest was nearing an end." He did not wish to leave the company, but "the company's attitude—towards both the old Trendwest guard in general, and me in particular—was leading me to believe that I might be next on the chopping block." Therefore, he declared, "by early May 2004, I decided that I better prepare myself for the event that the company may terminate my employment." Toward that end he applied to the Secretary of State to incorporate a potential time-share resale company. In doing so, he declared, "I had absolutely no intention of starting the business at that time, or at any time so long as I remained employed by Trendwest." Instead, he testified, he considered starting his own resale business "one of the options that potentially I should consider especially [since] . . . the company in the past has welcomed and worked with resale brokers that used to work for the company . . . ." He cited a specific example of a Trendwest employee whom he understood to have set up a time-share resale company while still employed by Trendwest, without "suffer[ing] any consequences for doing so." As for his use of the term "Worldmark," he declared, "[N]obody had ever told me—not even at my termination meeting—that using the name may be improper." "I simply had no idea," he declared, "that I was doing anything

wrong . . . ." When, after his discharge, he started the corporation and received a cease-and-desist letter regarding its name, he changed the name "[i]mmediately."[14]

### G. Termination of Employment

At some point between June 4 and June 23, 2004, Trendwest received a letter apparently mailed by a documents examiner with the California Secretary of State stating that the articles of incorporation for Worldmark Heaven, Inc., were being "return[ed], unfiled," for correction of a stated defect.[15] Although the envelope is not included in the record, it may have been addressed simply to "Trendwest" at its San Jose office. Enclosed with the letter was Mamou's May 19 check for the filing fee.

Although intervening events are far from clear, it is undisputed that on June 23, 2004, Fiore and Curtis convened a meeting with Mamou at which Fiore showed him the documents from the Secretary of State and terminated his employment. Trendwest asserts that at the meeting, "Mamou did not deny that he had attempted to establish a resale company using the Worldmark name." Mamou testified, however, that his attempts to explain his conduct were rebuffed and that nearly all the talking was done by Fiore, with Curtis sitting by and Lee immediately outside the door. At the start Fiore held up the incorporation documents and said, " 'This has been brought to our attention, and we decided to terminate you effective immediately. We would like you to pick up your personal belonging—belongings and leave the premises immediately.' [¶] I said, 'May I explain what this is all about?' [¶] He goes, 'No, no need to.' [¶] I said, 'Can . . . we call Staff Services or Steve Holmes or Corporate to explain?' [¶] They says, 'No.' [¶] I said, 'Can we have a change of status? Give me a specific reason why termination?' [¶] They says, 'No need to. We will need the keys. We want you off the premises immediately.' [¶] I said, 'Can I just elaborate and explain?' [¶] They says, 'No.' [¶] I said, 'Can I talk to—may I call the Corporate?' [¶] They says, 'No.' " At the

---

[14] Trendwest alludes to the supposed status of "Worldmark" as a protected trademark, but without citing any evidence of that status. Our independent review discloses deposition testimony by Trendwest Attorney Dempsey that "Worldmark . . . was a registered trademark that belonged to the company." Since this testimony was not cited for this point, however, Mamou had no opportunity to object to it.

[15] Trendwest asserts that it received the letter "on or around June 21, 2004," but the only evidence cited for this proposition is Attorney Dempsey's testimony that the decision to terminate Mamou's employment occurred on June 21 and was triggered by the documents from the Secretary of State, which came to his attention at some unspecified earlier time. This testimony hardly carries Trendwest's burden of establishing the date of receipt as beyond controversy, particularly in light of the statutory presumptions that a properly addressed letter is received in the ordinary course of mail (Evid. Code, § 641), and that a writing is truly dated (see id., § 640).

conclusion of this fruitless exchange, Curtis—who had not otherwise spoken—said, " 'I'm disappointed in you, my Arab friend.' " Fiore then escorted Mamou out of the office, saying that he wanted to be sure the key Mamou surrendered was actually his key to the premises.[16]

In a change-of-status form memorializing the termination of Mamou's employment, the reason for that action was given under the termination code "157: Misconduct/Theft/Violation of Policy." Although Fiore conceded in deposition that Mamou was not fired "for performance reasons," he instructed Meic on June 23, 2004, to "take the lead on building a file relating to Tamer's performance over the last six months." Specific areas to be addressed included "[d]isability claims" and "[o]ther HR related claims."

### H. *Discriminatory and Retaliatory Animus*

Mamou offered evidence to show that Curtis, Lee, and Fiore all "had a demonstrated bias against people of Middle Eastern or Arabic descent." In the case of Curtis, former Trendwest employee Robert Bishop declared that during a phone conversation in May 2004—the month before Mamou's dismissal—Curtis asked him, "What the hell is going on down there in that Northern California region with all those fucking rag heads," and said, "We've got to get rid of those fucking rag heads." Later, according to Mamou, it would be Curtis who capped the meeting at which Mamou was fired by commenting, "I am disappointed in you, my Arab friend."

With respect to Lee, former Walnut Creek employee Richard Hicks declared that "[d]uring 2004, both before and after Mr. Mamou's termination, I heard Mr. Lee bragging that he and the company were 'busting up' and 'getting rid of' the 'Syrian regime' and the 'Arab regime.' At the time of these statements, there were several Syrian or Arab management-level employees in the Northern California region." Former Trendwest employee Sandy Klein declared that during a visit to the Roseville office by Lee in the fall of 2004, Kristine Sevy came into the room where Klein was working and spontaneously said "that Carter Lee had just said to her that, 'I [Carter Lee] am here to get rid of the Syrian Regime . . . .' "[17]

---

[16] Trendwest dismissed this testimony below, asserting that it "is simply untenable." It is difficult to think of a question farther out of bounds on summary judgment than whether a witness's testimony is "tenable."

[17] Although the redundancy of the evidence makes the point academic for present purposes, Sevy's statement to Klein may be admissible over Trendwest's hearsay objection as an excited utterance. (Evid. Code, § 1240.) As Klein described it, Sevy had just come from speaking privately with Lee and "was very shook up, upset and excited." Speaking to Klein, Sevy called Lee's remark " 'a terrible racist thing to say.' " At trial it would be for the court to decide in the first instance whether Sevy's statement to Klein "[w]as made spontaneously while the

Jennifer Loftin declared that at a meeting at the Roseville office in October 2004—some four months after Mamou's dismissal—Lee announced, "The regime's time when Tamer was here is gone . . . ." Loftin understood this to be a reference to employees of Middle Eastern descent. Trendwest's blanket objection to this evidence is colorable as to this one statement on the ground that it constitutes opinion without any apparent foundation in personal knowledge. However, a fact finder could infer that Lee's references to a "regime" including Mamou—even if unaccompanied by a racist slur—were a tacit allusion to his Middle Eastern ethnicity. The comments echoed Lee's remarks to Richard Hicks about "busting up" and "getting rid of" the "Syrian" and "Arab" "regime." They also echoed remarks Mamou attributed in deposition to "David, the cleaner," who, as he reportedly complained to Fiore and Lee, "came in to the Roseville office, and . . . promised to get rid of the Middle Eastern regime, and [that he was] . . . coming to Walnut Creek to take care of me, get me blown out." Mamou also told them that David said he was "going to take care of Tamer Mamou, and that Middle Eastern regime is going to be gone."

Former Trendwest employee Anthony Pereira declared that in October 2004 he had a conversation with Carter Lee in which Lee "asked with a disgusting facial expression, 'Aren't you one of them?' I said to Carter Lee, 'Excuse me.' Carter Lee then responded, 'You know, Arab, Syrian.' I then told Carter Lee, 'No, I am Portuguese.' Mr. Lee then said to me, 'Oh, you are Mexican.' I then told Mr. Lee, 'No, I am Portuguese from Portugal.' " Later, at a meeting attended by Lee, Pereira recounted this exchange, whereupon Lee "stood up, pointed a finger in my face and abruptly screamed at me, 'You friggin liar. I said you were Arab.' "

Mamou testified in deposition that Fiore, for his part, developed and implemented a policy of turning away would-be customers of Middle Eastern and East Indian origin while explaining this action to vendors by designating the customers "H1," a code for persons lacking United States residency. The apparent gist of the testimony was that Fiore categorically spurned the business of such persons because "he believed those tours were difficult to

---

declarant was under the stress of excitement caused by [her] perception" of the reported statement by Lee. (Evid. Code, § 1240, subd. (b); see *People v. Smith* (2007) 40 Cal.4th 483, 519 [54 Cal.Rptr.3d 245, 150 P.3d 1224].)

Mamou also offered an unsworn document ostensibly written by Kristine Sevy in November 2004, addressed "To Whom It May Concern," purporting to recount a conversation in which Lee said to Sevy, among other things, " 'Listen, as far as the Syrian regime goes in this company, it has been busted in every office except for Roseville and that will happen soon enough . . . .' " Trendwest's hearsay objection to this unsworn statement appears unanswerable. There is no suggestion, for example, that Lee was confronted with this account and failed to deny it. (See Evid. Code, § 1221 [adoptive admission].) Likewise, Sevy's report to Loftin, long after the event, that Lee had said "that, 'The Syrian regime was no longer going to be running things and that they would be cleaning house,' " appears to be hearsay not within an exception.

sell and costing—affecting the bottom line of the store profitability." Mamou also testified that in his first meeting with Lee after the latter became regional manager, Lee appeared to confide in him that "Kevin doesn't like you, doesn't want you here. He doesn't think highly of you. He doesn't like Ed Nimri. He doesn't like Ayman Damlakhi, but if you guys play with the rules, especially you help me out, I can tell you Kevin Fiore will be out of a job. He's a—a bean counter. He doesn't know a damn thing about sales or marketing or resort timeshare business." Mamou asked, "Why would Kevin have a problem with me?" to which Lee replied that it was "more than I can tell you at this stage," repeating that Fiore and Curtis "will be gone." Assuming the named coworkers were also Middle Eastern—Nimri may be Indian, and Damlakhi appears to be Syrian—this testimony could constitute an admission by Trendwest's agent Lee that he had observed anti-Middle Eastern bias in his fellow supervisor, Fiore.

Mamou separately asserted that Fiore harbored animus toward him as a result of Mamou's e-mail of June 16, 2004, suggesting that his treatment with respect to stock options was discriminatory and retaliatory. In deposition Fiore described himself as "dumbfounded" by the e-mail, adding, "This was . . . the worst information I could have ever received in terms of, I guess, loyalty, in terms of professional courtesy, that sort of thing. So I took this as bad as you can." He declined to describe himself as angry, but said that he was "so disappointed that you can't even put it in words." Fiore felt that by sending e-mail to senior managers "with my name involved and retaliation and discrimination," Mamou was "hurting my credibility with senior management . . . ."

I. *Posttermination Events*

On the day after his discharge Mamou completed the incorporation of his company, apparently under the name Worldmark Heaven, Inc. Trendwest sent him a letter demanding that he stop using "Worldmark." Mamou declared that he did not realize the use of that term would be problematical: "I had seen many advertisements prominently [displaying] the name Worldmark and had never heard of Trendwest considering that to be in any way improper." He had never received any training on that point and had no education in trademark or intellectual property. Immediately upon receiving the cease-and-desist letter, he dropped Worldmark and changed his company's name to Timeshare Angels.

Mamou introduced evidence that after his discharge, Trendwest managers made numerous disparaging statements about him. Sandra Barese testified about a managers' meeting at the Roseville office, apparently in mid-October 2004, attended by Fiore and Lee. Lee announced that "the company had

evidence that somehow information of sales from Trendwest was being funneled to Tamer Mamou in order for our owners to cancel with us and purchase from him." Lee angrily declaimed that "business was being stolen from Trendwest, that there was evidence that there were company leaks, and some of these leaks came from our office. He was going to get to the bottom of this, and he was going to get Tamer. Tamer would pay for this. And no one was to have any conversation with Tamer Mamou, by threat of termination. And if or when—I don't recall which word—he found out who was leaking this information, they would be terminated." Apparently the gist of the accusation was that a current Trendwest employee was taking information concerning recent purchasers from the Roseville office and turning it over to Mamou, who then sold the purchasers a similar product, causing them to cancel their contract within Trendwest.[18] Lee specifically asserted that he had "evidence that this was happening," consisting of specific owner numbers. He did not state a number of owners, but he used the plural.[19]

After the meeting, Barese approached Fiore and asked him to "give me the owner numbers so I could go further and investigate, because it was our office. . . . [¶] So at that point he asked me—he said sure, send me an e-mail, remind me, which I did that day, and requested the owner numbers that he had and referred to in the meeting." She probably sent a copy to Lee. Fiore did not respond until after she sent a second inquiry, perhaps a week later. This is probably the message dated October 22, 2004, and appended to Fiore's deposition as an exhibit. In it, Barese asked Fiore to "forward me the owner number of the contract that was cancelled from our office and made a purchase from the resale company run by Tamer."[20] Fiore replied, "i can't

---

[18] It is undisputed that Mamou's brother Nader worked in the Roseville office. In its brief Trendwest appends this fact to another, as follows: "Mamou's brother Nader continued to work for Trendwest in Trendwest's Roseville office, where *he had access to owner names and information, even after Mamou's departure.*" (Italics added.) The clause we have italicized finds no support in the cited materials or, as far as we can tell, anywhere else.

[19] Fiore testified somewhat incoherently in deposition that Trendwest had in fact received complaints "asking why we were giving out their information to other companies," which caused him to be "very concerned that our proprietary information was being used by [Mamou]." Mamou's hearsay objection to this testimony is well taken insofar as the testimony is offered to show the truth of what owners actually said. It is not well taken—though a foundational objection would have been—insofar as the testimony is offered to show that complaints were received. The testimony appears unobjectionable insofar as it is offered to show that Fiore had a subjective belief in his accusations and thus made them without malice. Any such inference is so heavily controverted, however, that the evidentiary issues attending it are academic for summary judgment purposes. (See fn. 20, *post.*)

[20] Barese testified that in their initial presentation at the meeting, Lee and Fiore "certainly" conveyed that "there was more than one customer number." At some point it was communicated to Barese that there was only one such customer number. Eventually it emerged that there were no such customer numbers, or at any rate, that none could be found.

find that letter. i must have given [it] to either carter or bill or lost it. sorry. please let me know how it goes with your follow up."[21]

Barese attempted to investigate the Lee/Fiore allegations by calling every owner who had cancelled a contract within the preceding three months. She succeeded in contacting about two-thirds of them. One owner reported having cancelled a contract with Trendwest and "purchased resale," but from a reseller other than Mamou. Another owner "had gone home, found resale information on line, canceled, but at that time had not repurchased. And that was also not Tamer's company." Barese reported these findings to Fiore within perhaps a week of undertaking her investigation.

Months later, according to then Bakersfield project director Jerry Fleenor, Lee told him that Mamou was "in breach of his contract" and was "funneling leads to Timeshare Angels," which Fleenor understood to mean that Mamou "had stolen leads—potential customers—from Trendwest." Lee also told Fleenor "that while Mr. Mamou was working for Trendwest, he 'was stealing leads and databases from the company' and that the company had 'evidence or documentation that he [Mr. Mamou] did these things. In those same conversations, Mr. Lee told me that Mr. Mamou was 'totally unethical,' was a 'thief,' had 'no integrity,' was a 'poor performer,' was 'terminated for poor performance,' and had engaged in 'theft.' "

Robert Bishop declared that when he asked Lee why Trendwest had fired Mamou, Lee "told me that the company had discovered that Tamer Mamou had been stealing from the company . . . ."

Lee admitted in deposition that in addition to "characteriz[ing] [Mamou] as a thief" to Kevin Fiore and Richard Folk, he told them that Mamou was totally unethical and that he had no integrity. Lee allowed that he "probably" repeated this last assertion to Kim Roman.

## II. *Procedural Principles*

We summarized the principles governing an appeal of this type in *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 106–107 [16 Cal.Rptr.3d 717] (*Reeves*): "On appeal from an order granting summary judgment 'we

---

[21] The seemingly unlikely disappearance of this supposed documentation is sufficient to put in dispute Fiore's entire testimony on this subject, as most specifically summarized in his claim that "[w]e had gotten phone calls from owners. We had gotten letters from owners. We had gotten collateral material from Tamer's business asking why we were giving out their information to other companies." A contrary inference is supported not only by the negative results of Barese's investigation, but by Trendwest's failure to present any *records* of the supposed inquiries or complaints—even the "letters" Fiore claimed to have received.

must independently examine the record to determine whether triable issues of material fact exist. [Citations.]' [Citation.] The question is whether defendant ' " 'conclusively negated a necessary element of the plaintiff's case or demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial.' [Citation.]" [Citation.]' ([Citations]; see *Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 335, fn. 7 [100 Cal.Rptr.2d 352, 8 P.3d 1089] (*Guz*) ['the issue . . . is simply whether, and to what extent, the evidence submitted for and against the motion . . . discloses issues warranting a trial'].) . . . [Citation.] Moreover, 'we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [his] evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor. [Citations.]' [Citations.] And a plaintiff resisting a motion for summary judgment bears no burden to establish any element of his or her case unless and until the defendant presents evidence either affirmatively *negating* that element (proving its absence in fact), or affirmatively showing that the plaintiff does not possess and cannot acquire evidence to prove its existence. [Citations.]"

We also wrote, quoting *Guz v. Bechtel National Inc., supra,* 24 Cal.4th at page 334 (*Guz*), that "[w]e must 'consider[] all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained.' " (*Reeves, supra,* at pp. 106–107.) As a chief contributor to the jurisprudential chaos now surrounding the treatment of evidentiary issues on summary judgment, this statement has proven to be among the more mischievous dicta in recent history. It appears to originate in *Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 612 [76 Cal.Rptr.2d 479, 957 P.2d 1313] (*Artiglio*), where the only authority cited for it is the summary judgment statute, Code of Civil Procedure section 437c (section 437c), subdivision (c). But the statute says nothing about what evidence a *reviewing* court must consider. It directs "the court," meaning the trial court, to "consider all of the evidence set forth in the papers, except that to which objections have been made and sustained by the court . . . ." (§ 437c, subd. (c).)

The effect of extending this directive to a reviewing court is to grant conclusive effect to the trial court's treatment of the evidence before it, however patently erroneous that treatment may be. We would have thought it obvious that in reviewing summary judgment, as in any other appeal, if a party's position depends on patently inadmissible evidence admitted over a proper objection, a reviewing court would be empowered, and indeed obliged, to acknowledge the error and disregard the evidence. There is no reason to adopt a different rule merely because the trial court fails to expressly rule on a meritorious objection. Such failures are commonplace, because it has become practically impossible for the trial court to address each of the innumerable objections commonly thrown up by the parties as

part of the all-out artillery exchange that summary judgment has become. Yet under the *Artiglio* dictum, the trial court's failure to rule has the effect of defenestrating the entire Evidence Code for purposes of appellate review.

It takes little imagination to foresee that under such a regime parties will eventually learn, if they have not already, to load up their supporting and opposing papers with every factual assertion, competent or otherwise, that may support their position, reasonably expecting that the trial court will be too deeply submerged in the deluge of evidentiary and other procedural issues to rule correctly, if at all, on any significant fraction of them—let alone on the merits. This will force us to decide what to do when *flagrantly* improper evidence—say, an expert opinion by a lay witness, with no pretense of a factual foundation, on an ultimate issue—is pressed upon us as conclusive in view of the trial court's failure to sustain an objection. Perhaps this would generate a whole new body of law, a sort of mini-Evidence Code to accompany the minipleading code now developing in connection with the "separate statement" requirement of section 437c, subdivision (b).

A far better idea is to abandon this mischievous dictum and drain the whole evidentiary swamp to which it has contributed so greatly.

## III. *Employment Discrimination and Retaliation*

### A. *Mamou's Pleaded Causes of Action*

■ The California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.) declares it an "unlawful employment practice" for any employer "because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation of any person, . . . to discharge the person from employment . . . , or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." (Gov. Code, § 12940 (section 12940), subd. (a).) Mamou alleges that Trendwest committed such a practice by dismissing him and failing to pay him promised compensation because of his Syrian national origin.

■ It is also unlawful under the statute for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." (§ 12940, subd. (k).) Mamou alleges that Trendwest violated this provision by failing to take reasonable steps to prevent national origin discrimination in his workplace.

■ The statute also prohibits employers from "discharg[ing], expel[ling], or otherwise discriminat[ing] against any person because the person has

opposed any practices forbidden under this part . . . ." (§ 12940, subd. (h).) Among the "practices forbidden under this part" is discrimination against employees because of "medical condition." (§ 12940, subds. (j), (a).) In his third cause of action Mamou alleges that defendants' decision to terminate him was "based, at least in part, upon his complaining" about Fiore's and Lee's adverse treatment of employees who exercised their right to family medical leave, and thus constituted retaliation in violation of the foregoing provision.

Mamou also alleged that his discharge was independently tortious for violating public policy in that his national origin and complaints about unfair treatment of employees who took medical leave were a motivating factor in the decision to terminate his employment.

### B. *Elements and Presumptions*

■ Viewing the language of the statute in light of familiar principles of tort law, it would appear that the elements of a claim for employment discrimination in violation of section 12940, subdivision (a), are (1) the employee's membership in a classification protected by the statute; (2) discriminatory animus on the part of the employer toward members of that classification; (3) an action by the employer adverse to the employee's interests; (4) a causal link between the discriminatory animus and the adverse action; (5) damage to the employee, and (6) a causal link between the adverse action and the damage.

■ The elements of a claim for retaliation in violation of section 12940, subdivision (h), are substantially the same: (1) the employee's engagement in a protected activity, i.e., "oppos[ing] any practices forbidden under this part"; (2) retaliatory animus on the part of the employer; (3) an adverse action by the employer; (4) a causal link between the retaliatory animus and the adverse action; (5) damages; and (6) causation.

■ Proof of two of these elements—the second and fourth—is likely to depend on circumstantial evidence, since they consist of subjective matters only the employer can directly know, i.e., his attitude toward the plaintiff and his reasons for taking a particular adverse action. Given the resulting difficulties of proof, the courts have fashioned a special presumption shifting the burden of production—but not persuasion—to the employer upon a prescribed showing by the plaintiff. Specifically, the employee "may raise a presumption of discrimination by presenting a 'prima facie case,' the components of which vary with the nature of the claim, but typically require evidence that '(1) [the plaintiff] was a member of a protected class [or engaged in a protected activity], (2) he was qualified for the position he

sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory [or retaliatory] motive. [Citations.]' (*Guz, supra,* 24 Cal.4th at p. 355.) A satisfactory showing to this effect gives rise to a presumption of discrimination which, if unanswered by the employer, is mandatory—it requires judgment for the plaintiff. (*Ibid.*) However the employer may dispel the presumption merely by articulating a legitimate, nondiscriminatory reason for the challenged action. (*Id.* at pp. 355–356.) At that point the presumption disappears. (*Id.* at p. 356.)" (*Reeves, supra,* 121 Cal.App.4th at pp. 111–112; see *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802–804 [36 L.Ed.2d 668, 93 S.Ct. 1817].)

### C. *Prima Facie Case*

■ Trendwest says that Mamou has failed to make the "prima facie case" described above. It does not dispute Mamou's membership in a protected class or that there is evidence of his engaging in protected activity. Nor does it coherently dispute any of the other elements necessary to trigger the presumption. Instead it asserts that "Mamou has no evidence whatsoever that his national origin played any role in the decision to terminate his employment." This of course is not what the "prima facie case" requires. Properly understood, it *defines* what will constitute, in the first instance, evidence of wrongful discrimination or retaliation. And for purposes of that test, it is enough for the plaintiff to present "some other circumstance" that "suggests" a proscribed motive. (*Reeves, supra,* 121 Cal.App.4th at p. 112.) We think there is more than a suggestion of discriminatory motive in evidence that Curtis referred to "all those fucking rag heads," whom he pledged to "get rid of," and that Lee alluded to "busting up" and "getting rid of" the "Syrian regime" and the "Arab regime." As for *retaliatory* motive, on the evidence before the trial court a jury could readily infer that Fiore was "unhappy" when Mamou initially refused to participate in discriminating against persons on medical leave; that Fiore nonetheless persisted in seeking to enlist Mamou's aid; that when Mamou protested and stood fast in his refusal, both Lee and Fiore excoriated him for undermining their authority; and that Fiore was outraged when Mamou invoked the "open door policy" to protest to upper management his retaliatory or, as he by then feared, discriminatory treatment.

■ In sum there was ample evidence to sustain the "prima facie case" described above.

D. *Causation*

1. *Pretext*

As we have noted, the presumption of an unlawful employment practice arising from the employee's presentation of a " 'prima facie case' " affects only the burden of *production*, i.e., "the employer may dispel the presumption merely by articulating a legitimate, nondiscriminatory reason for the challenged action. [Citation.] At that point the presumption disappears. [Citation.]" (*Reeves, supra*, 121 Cal.App.4th at pp. 111–112.) The plaintiff then bears the burden of persuasion with respect to all elements of the cause of the action, including the existence and causal role of discriminatory or retaliatory animus.

■ Some courts have muddied the waters by stating that once the employer cites a reason, the "ultimate issue" is whether the cited reason was a "pretext." (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1117 [94 Cal.Rptr.2d 579]; *Taub v. Fleishman-Hillard, Inc.* (9th Cir. 2007) 256 Fed.Appx. 170, 172; *Hugley v. Art Institute of Chicago* (N.D.Ill. 1998) 3 F.Supp.2d 900, 906, fn. 7.) We have criticized this view before. (*Reeves, supra*, 121 Cal.App.4th at p. 111, fn. 11.) While "pretext" is certainly a relevant issue in a case of this kind, making it a central or necessary issue is not sound. The central issue is and should remain whether the evidence as a whole supports a reasoned inference that the challenged action was the product of discriminatory or retaliatory animus. The employer's mere articulation of a legitimate reason for the action cannot answer this question; it can only dispel the *presumption* of improper motive that would otherwise *entitle* the employee to a judgment in his favor. Thus, citing a legitimate reason for the challenged action will entitle the employer to summary judgment only when the employee's showing, while sufficient to invoke the presumption, is *too weak* to sustain a reasoned inference in the employee's favor. That, and not "pretext," must be the focus of the judicial inquiry.

■ However, evidence that the employer's claimed reason is *false*— such as that it conflicts with other evidence, or appears to have been contrived after the fact—will tend to suggest that the employer seeks to conceal the real reason for its actions, and this in turn may support an inference that the real reason was unlawful. This does not mean that the fact finder can examine the employer's stated reasons and impose liability solely because they are found wanting. But it can take account of manifest weaknesses in the cited reasons in considering whether those reasons constituted the real motive for the employer's actions, or have instead been asserted to mask a more sinister reality.

Here there was ample evidence to support such an inference, beginning with the fact that Trendwest never rested on a single coherent explanation for its firing of Mamou, and that several if not all of its explanations were, to put it mildly, questionable. In its official form memorializing the discharge, Trendwest entered the reason for the action as "Misconduct/Theft/Violation of Policy," but the precise nature of the asserted misconduct and the policy it supposedly violated remains in serious doubt, and to the extent it can be identified, appears heavily controverted.

The most elaborate account of Trendwest's decision to discharge Mamou was given by in-house Attorney Dempsey, who testified that he initially told CTRG's human resources director, Johnson, that he viewed the documents reflecting Mamou's attempted formation of a corporation as evidence that "someone who was a Project Director was attempting to steal from the company" and "acting in a manner that was absolutely inconsistent with his obligations to the company." This was followed by a conference call among Trendwest managers, which Dempsey commenced by telling the other three participants that, in his view, "this document represented theft from the company. That plain and simple, this was theft. That theft is a termination offense. That there is no exception to that." He spoke to them about previous incidents in his four years with the company "to emphasize to them the fact that this was theft within the meaning of company policy. And the fact that there were no exceptions that were made to an immediate termination." He and the other parties were all concerned "to make sure that there was not even the slightest indication that there was retaliatory motive here. That whatever action it was that would occur with respect to Mr. Mamou would have been the one that, you know, would have resulted even had he never raised a complaint, even if he didn't have the stock option issue, if he didn't send the E-mail. That, you know, we needed to deal with him the way that we would deal with anyone else who was stealing or attempting to steal from the company." Dempsey reported that there was talk of giving Mamou a "separation package" in view of the pending offer to resolve the welcome grant issue, but that Dempsey "strongly counseled against it" because he felt it would be "an exceedingly dangerous precedent to set here." At the conclusion of the call "[t]here was unanimous agreement . . . that we needed to treat Mr. Mamou according to company policy and terminate his employment."

But the record discloses neither the tenor of the supposedly offended policy, nor the nature of the precedents cited by Dempsey to his colleagues. Certainly Trendwest had a policy against theft, but the nature of the "theft" charged to Mamou remains mysterious. Asked to explain his use of this term, Dempsey first alluded to Mamou's attempt to use the Worldmark name, which was "intellectual property owned by the company." He then described Mamou as taking "an asset that he knows belongs to the company," consisting not only of the name but also "goodwill associated" with it, and to

"utilize that goodwill for his own purposes." "There is no difference," expounded Dempsey, "between doing that and walking in and taking money. There is none. It's theft from the company. It is—it is an asset that belongs to the company. To try to take a company asset and turn it to your own uses, that's theft."

Of course the first weakness in this depiction is that Mamou had not succeeded in "stealing" the Worldmark name, let alone any goodwill associated with it. All Trendwest knew was that he had attempted, unsuccessfully, to form a company including that term in its corporate name. His situation was not that of an employee caught taking money from the till, but more akin to that of one who is seen loitering around the till in a seemingly suspicious manner. An employer might genuinely decide not to trust that employee, but he could not genuinely conclude that the mere loitering constituted "theft." An employer who was genuinely concerned about the risk of theft, rather than intent on finding an explanation for a preconceived decision to get rid of the worker, might be expected to inquire into the worker's conduct. In this case, a fact finder could readily determine that the slightest inquiry would have revealed that Mamou had no intention of stealing the Worldmark name and on request would immediately desist from using it. Trendwest's very rush to judgment, without such an inquiry, supports an inference that the charge of "theft" was pretextual.

Moreover, even if the conduct had been more than inchoate—if Mamou had succeeded in forming the corporation while including "Worldmark" in its name—it would hardly constitute "theft" in the way that taking money from the till is theft. Both California and Florida, where CTRG has its offices, recognize theft as a crime whose gist is *depriving the owner* of his property. (*In re Jesus O.* (2007) 40 Cal.4th 859, 867 [55 Cal.Rptr.3d 523, 152 P.3d 1100]; *Daniels v. State* (Fla. 1991) 587 So.2d 460, 462.) While various forms of civilly actionable misappropriation may be loosely referred to as "theft," a finder of fact would be justified in questioning the genuineness of a *lawyer's* insistence that there is "no difference" between taking a man's money and using his trademark. Indeed some enterprises may encourage, or at least tolerate, the widespread use of their mark. Would the employee of an automobile manufacturer commit "theft" if, in anticipation of opening a dealership, he tried to form a corporation using his employer's mark as part of his business name? Further, while plaintiff's attempts to establish the point rested on evidence of debatable admissibility, we would be blind to reality if we did not observe that running the term "Worldmark" through an Internet

search engine discloses numerous Web sites, including a well-known auction site, prominently featuring that term for their own commercial purposes.[22]

In this light Dempsey's claim of trademark "theft" begins to appear not only questionable, but fanciful. Indeed, had trademark "theft" really been Trendwest's motivating concern, it might have been expected to immediately notify Mamou of the infringement and demand that he desist. Instead, according to Mamou's uncontroverted averments, no one said anything to him at the time of his dismissal about "stealing company property, engaging in attempted theft, or improperly using the Worldmark name. All they said was that they had found out that I was operating a competing business while I was working for Trendwest . . . ." Thus, even if Mamou's attempt to use the Worldmark name might be viewed as an inchoate misappropriation of trademark and, in a very loose sense, attempted theft, a fact finder could quite reasonably find that this was not the real motive for his dismissal.

Perhaps for these reasons, Dempsey did not rest the "theft" accusation entirely on Mamou's attempt to use Trendwest's mark and associated good-will, but professed to detect a further larceny: "[I]f Mr. Mamou were to open a resale company while still an employee of the company, there is an additional theft that would be occurring. . . . [¶] In his role as a Project Director or any role he would hold with the company, he has an obligation, a duty of loyalty to the company, to ensure that any sales opportunity for the purchase of Worldmark credits that he becomes aware of is directed to the company. This is a corporate opportunity that belongs to the company. And so if he were to be—open a competing business, which a resale business would be a competing business, he would be breaching his duty of loyalty and he would be stealing opportunities for sales that belong to the company."

Again the "theft" characterization is an exaggeration or caricature, which a jury would be entitled to view with a jaundiced eye. Technically speaking, no one can "steal" a business *opportunity*, because it is a mere expectation; it does not *belong* to anyone. An employee's appropriation of his employer's business opportunities is, as Dempsey testified, a breach of his duty of loyalty, but it is "theft" only in a loose, figurative sense. Again a jury could

---

[22] Mamou declared that certain documents attached to his declaration were given to him by a Trendwest customer who told him that he received them from Trendwest. The documents included advice ostensibly from Trendwest on reselling time-shares, as well as literature from various resellers, all containing repeated references to Worldmark. Although Mamou's aver-ment about what the customer told him was obviously hearsay, Mamou competently declared that the materials were given to him by the customer, and the materials included an envelope addressed to the customer and bearing a printed return address for Trendwest's Redmond, Washington, office, as well as a postmark with a matching ZIP Code. We need not determine whether these documents were adequately authenticated by these circumstances because we find no indication that Trendwest objected to them.

conclude that a lawyer should and would know better, and that his insistence on this characterization reflects not the expression of a genuine reason for action but an attempt to provide cover for some other motive.

An even greater difficulty with this rationale is its wholly hypothetical nature. If Mamou had started an active resale business while still employed by Trendwest it might have been expected to divide his *loyalties* and to impair his effectiveness as an employee, as well as create potential *opportunities* for the misappropriation of Trendwest business. This would surely justify a decision to compel Mamou to choose between the two masters, or indeed a conclusion that he had already demonstrated such a lack of loyalty that he should no longer be trusted with company business. But it would fall very far short of "theft," and it is far from clear that it would even constitute misconduct. It would simply reflect a conclusion that his value as a servant had been impaired beyond redemption.

■■■ Assuming that active involvement in a competing enterprise would necessarily constitute a sound reason for dismissal, there was and is no evidence that Mamou had actually done this. Again, all he appeared to have done was attempt to set up a corporate entity through which a reselling business *might* be conducted. For all Trendwest knew, or could know, or cared to know, Mamou was merely—as he insists—preparing for the contingency that he might have to part ways with Trendwest. An employee does not breach his duty of loyalty by *preparing* to compete with his employer. (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 414 [58 Cal.Rptr.3d 527]; *Fowler v. Varian Associates, Inc.* (1987) 196 Cal.App.3d 34, 41 [241 Cal.Rptr. 539]; *Bancroft-Whitney Co. v. Glen* (1966) 64 Cal.2d 327, 346 [49 Cal.Rptr. 825, 411 P.2d 921]; 19 Williston on Contracts (4th ed. 2008) § 54.27, p. 467, fn. omitted ["Employees whose contracts are terminable at will have a right to terminate their employment for the purpose of competing with their employer, and may plan and prepare to create a competitive enterprise prior to their termination, without revealing their plans to their employer, so long as they do so on their own time and with their own resources."].) This principle has been specifically applied to hold that an employee's mere formation of a potentially competing corporation does not breach a duty to his employer. (Williston on Contracts, *supra*, § 54:27, p. 467; *Chemfab Corp. v. Integrated Liner Tech. Inc.* (N.Y.App.Div. 1999) 263 A.D.2d 788, 790 [693 N.Y.S.2d 752, 754] ["while an employee may secretly incorporate a competing business prior to departing, the employee may not use his or her principal's time, facilities or proprietary secrets to build the competing business"]; *Futch v. McAllister Towing of Georgetown* (1999) 335 S.C. 598, 609–610 [518 S.E.2d 591, 597] ["Solicitation of an employer's customers likely will constitute a violation of the duty of loyalty in almost every case, while merely preparing and submitting forms to create a new corporation, for example, likely will be seen as permissible pretermination planning."];

*Instrument Repair v. Gunby* (1999) 238 Ga.App. 138, 139–141 [518 S.E.2d 161, 163–164].) Although the specific point appears not to have been applied in any California case, it has been recognized in Florida, where CTRG had its offices, and where Dempsey apparently practiced law. (*Harllee v. Professional Service Ind.* (Fla.Dist.Ct.App. 1992) 619 So.2d 298, 300, quoting *Fish v. Adams* (Fla.Dist.Ct.App. 1981) 401 So.2d 843, 845 [" 'an employee does not violate his duty of loyalty when he merely organizes a corporation during his employment to carry on a rival business after the expiration of his employment' "].)

Again, we recognize that Trendwest does not have to prove that Mamou committed an actionable breach of duty. But its continued assertions that he did so, when in fact it made no attempt to discover whether he had or not, and when it turned a stony ear to his pleas that he be permitted to explain, support an inference that the claimed reason for dismissing him was not genuinely felt but was instead assumed, like a cloak, to conceal some other motivation. A fact finder could reasonably doubt Dempsey's assertions of "theft" and breach of loyalty for both their hyperbolic and their hypothetical character.

Other dubieties might be found in Dempsey's testimony. Thus he suggested at one point that Mamou's conduct might have viewed differently had it been open: "[T]his is not an instance where Mr. Mamou came forward and said, hey, guys, do you mind if I open a company in this name? Hey, guys, do you mind if I open a resale company? Okay? He's out there doing this surreptitiously. He doesn't want us to know that he's doing it. [¶] That's—that's my take on this. Because if he had been up front, there are policies and . . . ."

Unfortunately, Trendwest cuts off the deposition excerpt at that point. What we have quoted is enough to show that, according to Dempsey, the supposed *secrecy* of Mamou's conduct played a significant role in the supposed rationale for firing him, such that Mamou might not have been dismissed had he approached Trendwest openly. The genuineness of this assertion could be reasonably questioned, first, on the ground that there is little if any evidence that Mamou was acting "surreptitiously." If he was truly intent on keeping his actions from Trendwest, he picked a singularly inept way of going about it, since he somehow managed to get his rejected documents mailed directly to Trendwest's offices. Although his submission to the Secretary of State has not been made part of the record, it seems reasonable to suppose that the documents were returned to whatever address was supplied by the applicant, Mamou. It follows that Mamou used his Trendwest business address when he could presumably just as easily have used another. In addition to reinforcing his claims that he did not believe he was doing anything wrong, this suggests that he was less than keen on secrecy.

Even if a jury concluded otherwise, it could infer a perfectly understandable reason for trying to keep his conduct secret—one even Dempsey might have been expected to recognize if he were analyzing the situation even-handedly—which is that Mamou did not wish to jeopardize his chances of ironing out his differences with Trendwest and continuing what he insisted was a happy and successful career there. Even if the attempted incorporation was wholly preparatory, its discovery by Trendwest might raise issues about his commitment to the company at a very delicate point in negotiations. In that light, a jury could find, his conduct was hardly perfidious, and could not have genuinely seemed so to Trendwest.

Beyond these extrinsic considerations, Dempsey could be found to have implicitly contradicted his complaint about Mamou's "surreptitious[ness]" when, three pages later in his deposition, he was asked whether he "ever consider[ed] asking Mr. Mamou what he was doing." He replied, "In my opinion, there was absolutely no explanation that he could give that would explain away his conduct. None. I would—I personally would not have been satisfied with anything short of . . . [']I was directed by Don Harrill to set up this company, and . . . the company was going to run it.['] [¶] Because all this stuff belongs to the company. . . . There was no explanation that was possible. He got caught with his hand in the cookie jar, and he suffered the consequences of everybody else who had been caught with their hand in the cookie jar." Dempsey went on to insist that it "would not have made a difference" if Mamou had been permitted to explain that he had only attempted to file the articles of incorporation "as a backup plan" against his possible dismissal: "He was using a trademark name, an asset that belonged to the company. He had absolutely no right to try to use that asset in any way, shape or form as a backup plan or otherwise. [¶] Taking that asset and trying to turn it to his own use is theft. And he will be fired for theft." Nor would it have availed Mamou, he testified, to explain that "not being a lawyer, he did not understand trademark or intellectual property law, and that, upon request, [he] would more than happily change the name so that there would not be any kind of trademark infringement . . . ." Other employees, said Dempsey, had "engaged in conduct that they genuinely did not believe was wrongful[,] [t]hat they genuinely did not believe constituted theft. That I, under the circumstances, in interpreting the company policy, did conclude was theft in accordance with company policy. They were fired."

Thus on the one hand Dempsey insisted that Mamou might have been treated more leniently had he simply been more forthcoming about his conduct; then he asserts that he can conceive of nothing that could mitigate Mamou's "theft." A fact finder could conclude that these were the after-the-fact constructions of an advocate and not an accurate description of the company's motives for firing Mamou.

There may also be a basis for questioning the genuineness of the charge of disloyalty insofar as it supposes that the contemplated resale business would *compete* with Trendwest. Although Dempsey argued this point in his deposition at length on grounds of abstract principle, Mamou contested it on grounds of fact. He denied in deposition that Trendwest treated time-share resellers as competitors on whom it "did not look favorably." Instead, he said, they are "part of the model," providing owners with a "way out" of their commitments by reselling their interests. He said Trendwest had a "love-hate deal" with the resellers, disliking their effect on the bottom line but recognizing that "the resale market had to be there."

William Dougherty, Trendwest's director of administration for the Northern California region, commissioned a study, apparently in May 2006, to determine how many prospective owners were rescinding purchases from Trendwest in order to buy from resellers. The study originated in a desire to test the common perception among Trendwest sales personnel "that the reason our rescission rate is so high is because people buy here and then they go home and buy off the resale market." He questioned this perception because the number of sales reportedly lost in this manner "just did not add up to the number of sales that could possibly be out there that they could purchase." He hypothesized that "people are canceling more for other reasons and just using resale as an excuse to get out of their contract." The study compared the list of names of transferees over a six-month period with that of persons who had rescinded purchases from Trendwest within the preceding six months. The study disclosed that "12 percent of the time the conditions were met that the person rescinded their contract and turned around and bought a WorldMark timeshare within at least six months of the time they canceled . . . ." None of the resales made through Mamou's company during the study period involved buyers who had previously rescinded purchases from Trendwest. Dougherty communicated to his own developer representatives, and probably to management when the subject came up, "that the resale market is not having the impact on the rescission that a lot of people are claiming that is happening."

To be sure, if Mamou had started an active resale business while still employed by Trendwest it might have been expected to impair his effectiveness as an employee by dividing his attention as well as his loyalties, and to create *opportunities* for the diversion to himself of business opportunities that Trendwest would otherwise reap. These effects would fall very far short of "theft" in *any* sense. Indeed it is far from clear that Mamou's conduct even constituted "misconduct" or a violation of company policy. He alluded to one employee who, as he understood it, had engaged in the resale business while still employed by Trendwest. That may have been a fairly weak showing, but to avoid summary judgment a showing need not be strong; it need only be sufficient to raise a triable issue of fact. And Trendwest pointed to no written

or clearly articulated policy against such conduct. Dempsey merely alluded to prior unspecified incidents of "theft" and claimed that Mamou's firing followed inexorably from these nebulous precedents.

The hypothesis that Trendwest's claimed reasons for dismissing Mamou were a rationalization and not the real cause of the dismissal receives considerable reinforcement from the broad array of other reasons given by Trendwest managers long after the fact, many of them seemingly made up out of whole cloth. As more fully discussed below in connection with the defamation cause of action, Trendwest managers at one time or another accused Mamou of stealing confidential company information and customers, of other unspecified unethical conduct, of lacking integrity, and of incompetence. Indeed Fiore, who in one breath insists that he viewed Mamou as an able employee, instructed one Trendwest human resources employee to start building a file on the subject of Mamou's job *performance*—conduct a fact finder could view as searching for a rationale with which to retroactively bolster the decision to dismiss Mamou. Indeed Fiore seemed incapable of rendering a coherent picture of the decision, not only in terms of who made it (as discussed more fully below), but also in terms of why it was made. He seemed to suggest in deposition that the purpose of his final meeting with Mamou was not merely to execute a decision that had already been made, but to give Mamou a chance to explain his conduct. This view contradicts nearly every material point for which Trendwest cites the Dempsey deposition. Yet a fact finder could readily conclude that, in the event, Trendwest brooked no explanation from Mamou and shooed him off the premises with only the humiliating implication that he would, if given the chance, steal a key.

### 2. *Identity of Decision Maker*

Not surprisingly, Trendwest does not place its chief reliance on the premise that it conclusively established the genuineness of its asserted reason for firing Mamou. Nor does it suggest that, for purposes of summary judgment, its supervisorial ranks were free of discriminatory or retaliatory animus. Instead the centerpiece of its entire case for summary judgment on the discrimination and retaliation claims is the notion that Mamou cannot show "a discriminatory animus on the part of *Harrill, DeSimon Johnson, and Dempsey . . . , the three individuals who made the decision* to terminate Mamou's employment." (Italics added.) This proposition—that Mamou was fired by these three individuals, and not by the Trendwest supervisors who could be found to have acted out of impermissible motives—is asserted in Trendwest's brief no fewer than 14 times directly and many more times by implication. Repetition is hardly a crime, but neither can it give legs to a proposition that cannot stand on its own.

Trendwest's position depends entirely on Dempsey's deposition testimony concerning the telephone conference at which, according to Trendwest, the termination decision was made. Johnson also testified about the meeting but declined to answer many questions about it, saying, "I really don't remember a lot about the conversation." So far as this record indicates, her testimony, if anything, weakened the claim that the decision was the result of a consensus reached at this meeting. Asked whether she "concur[red] in the decision to terminate Mr. Mamou," she gave the qualified response, "I supported it," which could be taken to mean that she saw her role as merely approving a decision made by others.

This leaves Trendwest to rely entirely on the testimony of Dempsey that, after he examined the incorporation documents, he and Johnson convened a telephone conference joined by Trendwest president Harrill and one other participant, who Dempsey thought was probably Curtis, but possibly Fiore. At the conclusion of the call, he testified, "[t]here was unanimous agreement . . . that we needed to treat Mr. Mamou according to company policy and terminate his employment."

If it stood alone this evidence might be sufficient to establish for summary judgment purposes that the operative decision was made at this conference. To the extent it supports such a finding, however, it conflicts with reasonable inferences to be drawn from the account given in deposition by Fiore. He testified that upon learning of Mamou's attempt to incorporate, he went to Curtis and "recommended" firing Mamou—which may be understood to imply that the decision was vested in Curtis, who had reportedly proclaimed his desire to "get rid of those fucking rag heads." However, continued Fiore, he and Curtis concluded that it was desirable to "consult" with upper management to be sure it was "comfortable with the decision."[23] This hardly indicates that the actual decision to fire Mamou came from someone above Fiore and Curtis. Indeed, it suggests the opposite: that the decision rested in the hands of Fiore, Curtis, or both, but that in view of the ongoing difficulties over the welcome grants, Mamou's assertions of discrimination and retaliation, his threat to consult counsel, and Trendwest's insistence on a general release as part of any negotiated accommodation, Fiore and Curtis were unwilling to carry out their decision without first securing the assent of upper

---

[23] "Q. . . . [¶] What did you do [when you learned about Mamou's attempt to form a corporation]? . . .
"A. I believe I called Ted Curtis and discussed the issue with him.
"Q. After you spoke with Ted Curtis, what did you do?
"A. My recommendation was that we terminate him, but we wanted to make sure that others that, you know, had authority to do that as well, were comfortable with the decision.
"Q. What other people?
"A. Don Harrill, [c]ounsel. I guess those were the people that we were really worried about."

management, and—perhaps most particularly—the legal department. In this light, the more reasonable view of Fiore's testimony—certainly *a* reasonable view—is that he and Curtis in fact made "the decision," and that the meeting described by Dempsey was simply upper management concluding that it was, in Fiore's words, "comfortable with the decision."

Fiore could also be understood to believe that when he met with Mamou on June 23, he was vested with the authority *not* to fire him if he so decided. Thus he acceded to the proposition that he went to Mamou's office "to talk to Mr. Mamou about the rejected application for a corporation that [Fiore] believed was competitive to Trendwest." The purpose of the "meeting" was for Mamou "to explain what the application was for and what he intended on doing with it . . . ." "[W]e wanted to make sure that Tamer was given an opportunity to address why he would start . . . this competitive company. . . . [S]o that was the decision. Make sure we give Tamer an opportunity to discuss why he would do that, but in the meantime—this is what I recall, a quick turnaround—we also talked with counsel." Again the implication, particularly of the last clause, is that Fiore was not bound to fire Mamou, but had secured prior approval to do so in order to act quickly if that were his decision.

Given the conflicted state of the evidence, it is not surprising that even Trendwest's own characterization of these facts seems internally inconsistent. On the one hand the termination decision is depicted as having been made by upper management, with nothing for Fiore to do but carry it out. Elsewhere, however, Trendwest asserts that "Fiore and Curtis met with Mamou . . . to confront him regarding the proposed articles of incorporation." Again it can readily be inferred that Fiore wanted to fire Mamou and that the ultimate decision was his but that, in view of recent difficulties, he did not want to assume the responsibility for doing so without an imprimatur from the lawyers and upper management.

Indeed, when asked, "who determined that you should go speak with Mr. Mamou in his office," Fiore responded, "I'd say it was a mutual decision; that ultimately, you know, *I was responsible for making that decision*; that we wanted—that I wanted to talk to him in person." (Italics added.) He went on to say that Curtis accompanied him in order "to support me with *the decision that, you know, I had made*." (Italics added.) While this testimony is less than crystal clear with respect to what "decision" he had in mind, a fact finder could surely conclude that he meant the decision to fire Mamou. Trendwest so interprets this testimony, citing it for the fact that Curtis accompanied Fiore in part "to support Fiore in carrying out the termination decision." And this view is entirely consistent with Fiore's testimony that his responsibilities as regional vice-president included human resources functions and specifically "[h]iring [and] firing."

In the event, Fiore testified, he did not allow Mamou much of a hearing. He could not recall Mamou's "exact words" of explanation—or, apparently, any words, since, as Fiore went on to allow, "There wasn't a lot of discussion at all, content. There wasn't a hell of a lot of content around it." Still, he quoted himself as responding to Mamou's unrecounted explanation by saying, " 'That's *not good enough*. We're going to have to go separate ways and *I'm going to have to let you go*.' " (Italics added.) Yet again the implication is that Mamou was not fired, and was not bound to be fired, until Fiore fired him. A further implication to similar effect flows from Fiore's affirmative response to the question, "So prior to entering Mr. Mamou's office that day . . . had you decided, in your mind, that *if Tamer did not have a sufficient explanation* for filing these documents, that you would terminate his employment?" (Italics added.)

In this light Fiore's declaration in support of summary judgment appears fraught with ambiguity. Neither he nor anyone else flatly declares that the actual decision to fire Mamou was not his, or Curtis's, or his and Curtis's. In his most nearly pertinent averment, Fiore states, "After my initial consultation with Ted Curtis but prior to my meeting with Mamou . . . , either Ted Curtis or an in-house attorney *informed me* that upper management . . . had concluded that Mamou's employment *should be terminated*, and had concluded that I should be the one to carry out the termination decision." (Italics added.) Ignoring the curiously attributive nature of this evidence—as we must, since Mamou neglected to object to it (see § 437c, subd. (b)(5))—it establishes nothing more than that upper management rendered an opinion that Mamou "should be terminated." This is consistent with Fiore's testimony that he himself had the responsibility to decide, and did decide, whether Mamou would in fact be terminated. Further, to the extent it is inconsistent with that testimony it is wholly ineffectual to sustain the present judgment, since the conflict itself obviously raises a triable issue of fact. The central support for Trendwest's motion thus collapses.

Even if we were to disregard the inferable conflicts between Dempsey's and Fiore's testimony, or for that matter to ignore the latter testimony altogether, we would be hard put to conclude that Trendwest has dispelled all triable issues of fact with respect to the participation of Fiore in Mamou's dismissal—or of Curtis, as to whom there was if anything more compelling evidence of actionable animus. For one thing Dempsey himself testified that either Fiore or Curtis was a participant in the conversation at which the supposed collective decision was made. Trendwest paraphrases Dempsey as having testified that "Curtis <u>might</u> have been on the conference call during which the decision to terminate Mamou's employment was made . . . ." But Dempsey did not say that Curtis "might" have been involved; he said that a fourth person *was* involved, and that it was "probably" Curtis, but "could have been" Fiore. Trendwest also denies that there is "evidence anywhere in

the record that Curtis made or otherwise influenced that decision." But Trendwest offers no evidence that *anyone* influenced the decision except Dempsey himself, whose account of the conference consisted largely of the opinions he expressed there. It is Trendwest who seeks to establish beyond a triable issue of fact that any animus held by Curtis and Fiore was immaterial because they were not involved in Mamou's dismissal. For purposes of this appeal, the contrary inferences arising from Trendwest's own evidence must be accepted as true.

We conclude that triable issues of fact persist with respect to the discrimination causes of action and that the trial court erred in summarily adjudicating them.

## IV. *Defamation*

### A. *Mamou's Pleaded Cause of Action*

In his ninth cause of action Mamou alleged in essence that defendants conspired to, and did, defame him by attributing misconduct to him with various degrees of specificity; that they overpublished and caused the foreseeable republication of these statements; that the statements were false; that the publications were "made with hatred, ill will, and an intent to vex, harass, annoy, and injure" Mamou; and that defendants had no reason to believe the statements, did not believe them, and knew them to be false. On summary judgment, Trendwest contended, and the trial court apparently held, that the challenged statements were privileged, nonactionable opinion, true, or a combination thereof.

### B. *Discussion*

#### 1. *Opinion and Truth*

We may readily dispose of the proposition that defendant's statements were nonactionable statements of opinion, for Mamou presented substantial evidence that at least some of the challenged statements were flat assertions of fact. Thus Sandra Barese testified that in October 2004, Lee told the Roseville managers that "the company had evidence that somehow information of sales from Trendwest was being funneled to Tamer Mamou in order for our owners to cancel with us and purchase from him." Lee stated that specific instances of this, linked to specific customer numbers, had been identified. Fiore adopted and republished this statement, telling Barese—as a jury would be entitled to find—that he had at least one letter from, or referring to, a specific customer. There is no suggestion that these statements were "phrased in terms of apparency," either "cautiously" or otherwise. (*Gregory v. McDonnell*

*Douglas* (1976) 17 Cal.3d 596, 603 [131 Cal.Rptr. 641, 552 P.2d 425]; see *Simpson Strong-Tie Co. Inc. v. Gore* (2008) 162 Cal.App.4th 737, 763 [76 Cal.Rptr.3d 292].) On the face of them, they are defamatory statements of fact.

Respondent cites *Jensen v. Hewlett-Packard Co.* (1993) 14 Cal.App.4th 958, 966 [18 Cal.Rptr.2d 83], where the court concluded that there was no actionable assertion of fact in statements that an employee "had been the subject of some third party complaints, was not carrying his weight, had a negative attitude in dealing with others, evidenced a lack of direction in his project activities and was unwilling to take responsibility for the projects he oversaw." (Fn. omitted.) We certainly agree that a couple of these assertions are statements of opinion, e.g., "not carrying his weight" and "evidenced a lack of direction." But at least one of them could be found to convey a provably false assertion of fact, i.e., that third parties had complained about the plaintiff. This either happened or it did not. Likewise, either Mamou had engaged in acts of perfidy or he had not. The assertion that Lee and Fiore had documentary proof of such acts all but precludes a finding that their accusations constituted nonactionable statements of opinion.

Even the statements on which Trendwest focuses for this argument—that Mamou lacked integrity, that he was unethical—could be found to convey an actual imputation of fact if they implied the speaker's possession of undisclosed supporting facts. (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 266 [228 Cal.Rptr. 206, 721 P.2d 87].) Here a jury could find that Lee and Fiore not only *implied* the possession of corroborating defamatory information but flatly *stated* that they possessed such information. Trendwest is free to argue to a jury that when Trendwest managers accused Mamou of a lack of integrity and ethics, they were merely drawing their own conclusions from what they supposed was his disloyalty in undertaking to create a corporation for the operation of his own resale business. But Trendwest was hardly entitled to summary judgment on that theory, which a jury could quite reasonably reject in favor of a finding that, in light of the circumstances including Lee's and Fiore's other defamatory statements, these comments did not convey a mere unprovable opinion but implied the possession of undisclosed, and provably false, defamatory facts. (Cf. *Simpson Strong-Tie Co., Inc. v. Gore, supra*, 162 Cal.App.4th at p. 759.)

Nor can the summary adjudication of these claims be sustained on the ground that the challenged statements were substantially true. (See Civ. Code, §§ 45, 46; *Campanelli v. Regents of University of California* (1996) 44 Cal.App.4th 572, 581 [51 Cal.Rptr.2d 891].) Trendwest offers only the most perfunctory argument on this point, asserting that by attempting to form a resale corporation while still employed at Trendwest, Mamou actually engaged in theft, misconduct, and violation of Trendwest policies. Even if this

entire proposition were accepted it would not reach Lee's and Fiore's statements—presumptively false for purposes of this motion—that Mamou engaged in documented instances of misappropriation of Trendwest's proprietary information. (See § 437c, subd. (f)(1) [summary adjudication must go to entire cause of action, defense, claim for damages, or issue of duty].)

### 2. *Privilege*

We come to Trendwest's only colorable argument for summary adjudication of the defamation claim, which is that all of the statements challenged by Mamou were subject to the common interest privilege of Civil Code section 47, subdivision (c), which declares a communication privileged if it is made "without malice, to a person interested therein, (1) by one who is also interested . . . ." Application of the privilege, as with any conditional privilege in defamation law, involves a two-step inquiry. The first question is whether the factual predicate for the privilege was present—whether, in traditional terms, the " 'occasion' " was " 'privileged.' " (*Taus v. Loftus* (2007) 40 Cal.4th 683, 721 [54 Cal.Rptr.3d 775, 151 P.3d 1185].) At trial the defendant bears the burden of proof on this question. (*Ibid.*) If he succeeds, the burden shifts to the plaintiff to show that the statement was made with malice. (*Ibid.*) On summary judgment, of course, the defendant bears the burden of showing in the first instance that there is no triable issue of fact as to either issue—that the statement was made on a privileged occasion, and that it was made "without malice." We need not concern ourselves with the first question because the case presents triable issues with respect to the existence of malice.

For purposes of a statutory qualified privilege, "[t]he malice referred to . . . is actual malice or malice in fact, that is, a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person. [Citation.] The factual issue is whether the publication was so motivated. 'Thus the privilege is lost if the publication is motivated by hatred or ill will toward plaintiff [citations], or by any cause other than the desire to protect the interest for the protection of which the privilege is given' [citations]." (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 944–945 [160 Cal.Rptr. 141, 603 P.2d 58], repudiated on another point in *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574, fn. 4 [88 Cal.Rptr.2d 19, 981 P.2d 944].)

Here a jury could easily find that the statements by Lee and Fiore were motivated by ill will towards plaintiff. For one thing there was the evidence that Lee was hostile toward Mamou as a member of the "Syrian regime" some members of Trendwest management had, inferentially, undertaken to purge. As for Fiore, he testified that he was "so disappointed that you can't even put it in words," and "took [it] as bad as you can," with respect to what

he perceived as Mamou's breaches of "loyalty" and "professional courtesy" in sending e-mail to senior managers linking Fiore's name with "retaliation and discrimination." A jury would be entitled to find that these feelings would naturally engender spite and ill will toward Mamou, and that this was what motivated Fiore to utter what the jury could find were baseless and, inferentially, knowingly false allegations.

Separate evidence of malice in Lee's case can be found in his statements to Roseville managers, as reported by Barese, that he was going to "get" or "get even" with Mamou. Further circumstantial evidence is found in the persistent repetition of the accusations despite their apparent groundlessness. It would have been one thing if Lee and Fiore had told the Roseville managers that they feared or suspected that Mamou was using proprietary information to steal Trendwest customers. But according to the evidence marshaled by Mamou, they claimed to have specific evidence of specific instances of this—"customer numbers," as they put it. A jury could find that this was a deliberate lie, and that its utterance could only be intended to injure Mamou by causing him to be shunned and avoided. Indeed, they directly *ordered* employees to shun and avoid him, on pain of termination. Obviously, a jury could find that this same injurious objective motivated the accompanying accusations. If it did, those accusations were accompanied by actual malice, and the qualified privilege afforded no defense.

Further potent evidence of malice is found in the averments of Walnut Creek employee Hicks that on multiple occasions after Mamou's discharge, "Mr. Lee tried to get me to make negative statements about Mr. Mamou. For instance, Mr. Lee tried to get me to say that I had seen Mr. Mamou in the Verification Loan Officer's ('VLO') [office] alone with the door closed. The VLO's office is where customer lists and other confidential customer information is stored. . . . I refused to make this statement because it was untrue." Indeed, all indications are that Mamou never had access to confidential information. It appears that Trendwest's customer and marketing information is held in a database using software known as Qantel. Internal inquiries indicated that Mamou had never had access to this system. Dougherty reported this finding, in e-mails copied to Fiore, on September 14 and 16, 2004, which could be found to have been about a month before the meeting at which Lee and Fiore told a roomful of Trendwest employees that they had documented evidence of Mamou's perfidy.

Similarly, although Fiore conceded that Mamou was not fired for poor performance, he acknowledged that on the day of the firing he instructed Meic to "take the lead on building a file relating to Tamer's performance over the last six months." Specific areas to be addressed included "[d]isability claims" and "[o]ther HR related claims." Similarly, there is evidence that Lee

told Fleenor that Mamou was not only a thief lacking ethics and integrity, but was also a "poor performer" and terminated for that reason. On the present record it is difficult to see this statement as anything other than a deliberately injurious falsehood.

We need not parse the various statements at issue to ascertain whether there is evidence of actual malice as to each of them. It is enough if the evidence presented a triable issue of fact on that point as to any of them. Since it obviously did, the trial court erred by granting summary judgment on the defamation cause of action.

Disposition

The judgment is reversed.

Premo, J., and Elia, J., concurred.