Filed 10/7/13  Lopez-Canzano v. City of Los Angeles CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SEVEN

| | |
|---|---|
| YOLANDA LOPEZ-CANZANO, | B245830 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC475589) |
| v. | |
| CITY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from an order of dismissal of the Superior Court of Los Angeles County, Holly E. Kendig, Judge.  Reversed.

Law Offices of Linda M. Battram and Linda M. Battram for Plaintiff and Appellant.

Carmen Trutanich, City Attorney, and Paul L. Winnemore, Deputy City Attorney, for Defendants and Respondents.

_____

## INTRODUCTION

The trial court sustained without leave to amend the defendant's demurrer to the plaintiff's first amended complaint for gender and age discrimination and ordered plaintiff's complaint dismissed.  The plaintiff appeals.  We reverse.

## FACTUAL AND PROCEDURAL SUMMARY

In her original complaint, Yolanda Lopez-Canzano (Canzano) filed a complaint against the City of Los Angeles (City) and Carl Oschmann alleging causes of action for (1) discrimination in violation of the Fair Employment and Housing Act (FEHA), (2) defamation in violation of Civil Code section 47.5 and (3) retaliation.  Following the City's demurrer, Canzano filed an amended complaint, asserting one cause of action for gender discrimination in violation of FEHA and a second for age discrimination under FEHA.

According to her first amended complaint, at all relevant times, Yolanda Lopez-Canzano (Canzano), a female over the age of 40 (born in 1966), was employed as a police officer with the Los Angeles Police Department (LAPD), which acted through its officer Carl Oschmann, a white male.  (In her first amended complaint, Canzano defined the City of Los Angeles as the only defendant.)

Following a career in the military, Canzano alleged, she had previously pursued a career as a police officer and detective with the Department but her application was denied solely because of her gender and related height.  She then found a job with the Department of Water and Power (DWP) where she worked for the next 21 years.  During that time, a class action was filed against the LAPD because of the discriminatory effect of the height requirement.  In 1997, she says, the Chief of Police called for the elimination of all height restrictions, "but the debate continues."

When she learned the height restriction had been stricken, she arranged to take a leave from her DWP position to pursue her lifelong dream of becoming an LAPD police officer and detective, with the plan to go into administration.  She successfully completed

training at the police academy, which she attended from April 27, 2009 through March 26, 2010 and was successful in getting a job as a police officer on or about March 29, 2010. During her one-year probationary period, Canzano alleged, she received 24 satisfactory (biweekly) reviews, passed and was then promoted to the next level, with reviews to be provided monthly.

Canzano's satisfactory reviews ceased upon her assignment to Oschmann, who reputedly had 20 years of experience as an officer. According to the allegations, Oschmann was known at the LAPD to be discriminatory toward female probationary officers and other LAPD employees; he talked down to women officers and citizens and intentionally derailed female employees' careers when given the opportunity by the LAPD. On his first day of working with Canzano, Oschmann told her he was taking over her training, falsely claiming a female officer did not want to train Canzano because she is a female when in fact he was covering up his intention to fail her. That first day, Oschmann told Canzano she was on her own, he was not going to provide her with any training, and if she got into an altercation, she was on her own because he was looking to retire and was not about to get hurt. He did not treat male trainees in this manner.

According to Canzano, the LAPD provided Oschmann multiple occasions to derail her career in order to have her terminated because of her gender and age as follows: (1) knowing Oschmann's animus toward women and specifically Canzano, the LAPD allowed Oschmann to train Canzano even though a female officer had already been assigned to train her; (2) allowed Oschmann to hold her back when she was considered promotable by everyone else more familiar with her performance, such as Officer Tamura; (3) denied Officer Ward's request to relieve Oschmann from training Canzano despite her complaints of discrimination and harassment; (4) because Oschmann is male, accepted Oschmann's false version of the facts regarding a September arrest in which he claimed he was hurt because Canzano "froze" when in fact he was hurt because the suspect fell on him and despite the fact the suspect was brought in with handcuffs issued

3

to Canzano, not Oschmann; and (5) demoted Canzano for no legitimate reason. Moreover, she alleged, when she questioned her demotion, she was informed after the fact it was because Oschmann refused to sign off on her Blue Book, despite the fact it was Oschmann's responsibility to sign off and despite Canzano's repeated requests for Oschmann's signature. In fact, he never refused to sign but rather always said he would do it later. Notice of any Blue Book deficiency was supposed to have been given to her before her probationary period was up so she could take action she alleged; instead, however, such notice was given after she inquired and no one could identify a reason for her demotion.

Canzano said she was singled out for harsher treatment, received poor and inadequate treatment from Oschmann and, on December 9, 2010, was ultimately terminated by LAPD with no reason given, because of her gender and age, not due to her performance or ability.

As examples of Oschmann's gender animus, Canzano cited the following: (1) Without notifying Canzano, Oschmann left instructions requiring Canzano and only Canzano to return to the station to be excused by the Watch Commander when white males as well as females training with officers other than Oschmann (including Canzano prior to Oschmann's takeover of her training) were permitted to leave directly from the site. When Canzano continued to do so, as she had done in the past along with the other trainees, she was issued a comment card, unaware she had been singled out. (2) Oschmann deliberately delayed his response time whenever a call involved women and their children. (3) On or about July 23, 2010, Canzano's son required emergency medical attention and was transported to the hospital. While at work, Canzano was informed of this and told Oschmann her son would need surgery in a few hours. When she explained what had happened to Oschmann and asked to leave two hours later to help her son, Oschmann dismissed her and demanded she return to the station immediately. When she tried to tell him she could work until the surgery, he said she should have stayed at her

4

old job if her family came first instead of coming to LAPD and ordered her to the station immediately. (4) Oschmann constantly referred to women as "bitch" and "bitches" although he did not refer to men in such derogatory terms. (5) At no time did Oschmann provide Canzano with any training, guidance or criticism of her performance and instead kept her confined in the patrol car for the vast majority of the time, engaged in personal questioning of Canzano and expressing his personal biases, although he did ridicule her in front of others on more than one occasion. On one occasion, Oschmann wanted to go to El Pollo Loco so Canzano drove as he directed into the virtually empty lot, but then he photographed the car; when she asked why, he muttered something about one of the other officers being Mormon but refused to explain. Later, he ridiculed Canzano in front of others, saying she did not know the rule an officer is to select the easiest space from which to exit in case of emergency. He refused to teach her and instead set her up for failure although he did not treat male probationary officers in this manner. (6) Oschmann constantly talked down to Canzano in a tone and manner she heard him use with other females, but never with white males. (7) The Supervisory Blue Book is a binder in which the training officer (Oschmann) would go over the areas in which he has trained a probationary officer in the field, gives a mock test and then sends the trainee to a supervisor who will quiz/test the trainee in those areas and sign off on the book. Canzano's previous training officers had ensured Canzano's entries were signed off by a supervisor. The chain of command is that the training officer is to quiz/test the probationer. Throughout her entire time assigned to Oschmann, Canzano asked and reminded him about getting signed off in the book. He never indicated he had any reason not to carry out this duty; he always said he would do it later, or not now, or he was too busy or he could do it tomorrow.

Similarly, with respect to her age, Canzano alleged, rather than providing training during "down time" as other officers had done, Oschmann questioned Canzano extensively about her age, her 16-year military career on active duty and as a reservist

5

and her 21-year prior career at the DWP. He questioned how she could possibly have become a Squad Leader and Staff Sergeant in the Army and a supervisor at the DWP. He elicited from Canzano her goal to become a supervisor at LAPD—perhaps Oschmann's supervisor. She intended the statement to be friendly, but he took offense because he did not like the idea of Canzano, an older woman, becoming his supervisor "late" in her career. According to Canzano, he constantly insinuated and often stated to Canzano and others she never should have left her prior job to try to be a police officer at her age, and she was too old to be a police officer, constantly discouraging her in what he regarded as her choice to join the police force after two other careers or having "such a successful career doing office work," always expressing his disapproval because of her age when it was only the LAPD's height restriction that had prevented her from starting her career earlier.

On or about September 3, 2010, without stating any basis, Oschmann requested the extension of Canzano's probation. She made multiple inquiries but no one could provide a reason. On or about September 23, 2010, Captain Ryan gave Canzano interdepartmental correspondence stating the reason for the extension was because she did not have her supervisor's signature in the Blue Book for all portions of her training, despite the fact she should have been given notice before any extension to allow her to take action to cure, and no white male would have been treated in this manner.

Meanwhile, she alleged, Officer Tamura and others reviewed Canzano's performance record and could find no evidence and no record she had failed or was sub par. In his review of Canzano's probationary reports, Officer Tamura found Canzano's "write-ups" were equal to the other male probationary officers' write-ups, expressed his disbelief at the way Canzano was singled out and countermanded the extension so Canzano was reinstated.

Determined to fail Canzano because of her age and gender, however, Oschmann went above Officer Tamura and "somehow managed to reverse the decision" so she was

6

demoted a second time. Later, Canzano was informed and now believes Oschmann manufactured and inserted a negative performance review in her record because one appeared in her file although it had not been given to her before. Because her complaints about Oschmann's discrimination and harassment went unheeded and the City instead supported and ratified Oschmann's actions, Canzano then knew Oschmann wanted to hold her back to cause her to fail so she asked Training Officer Ward (an African American male) if he could protect her from Oschmann's actions and request that Canzano become Officer Ward's probationer. Although Officer Ward wanted to help Canzano, he was going to be on vacation for one month and would ask upon his return.

On or about September 3, 2010 (the date Canzano alleged Oschmann requested the extension of her probation for no reason), Oschmann was hurt on the job when he neglected to move out of the way of a suspect falling in a failed attempt to scale a wall. He and Canzano had been pursuing the suspect on foot. Because of her shorter stature, she alleged, she was able to move out of the way, and then pounced on the suspect, cuffing and arresting him. Despite the fact Canzano had already cuffed the suspect and subdued him on the ground, Oschmann tasered the suspect twice for no apparent reaason. Each time he directed Canzano to step aside. She did so but questioned the unnecessary tasering.

Thereafter, Oschmann falsely blamed Canzano for his injury, "deeming her 'unsafe' and destroying her career." Oschmann pretended to be severely injured because Canzano "froze and did nothing" but was actually enjoying himself on vacation.

Canzano alleged she was subjected to a hostile work environment because of her gender and age in that she was singled out and set up to fail, inadequately trained, demoted and terminated in violation of FEHA. Initially, she was given no reason for these adverse actions, and when reasons were given later, they were merely a pretext for unlawful discrimination as Canzano alleged she had performed satisfactorily, she was not responsible for the incomplete Blue Book.

7

As an exhibit to her first amended complaint, Canzano attached a copy of the claim she filed with the Department of Fair Employment and Housing, in which she further described her time at LAPD.

The City filed a demurrer to Canzano's first amended complaint, arguing she had failed to sufficiently state her causes of action for gender and age discrimination, and Canzano filed opposition.

After taking the matter under submission, the trial court issued its ruling sustaining the City's demurrer to both causes of action without leave amend and then ordered the action dismissed. The court agreed with the City that Canzano had "added little or nothing in the way of supportive facts" after being granted leave to amend following the initial demurrer. The trial court further agreed with the City that Canzano had only shown "stray remarks" by Oschmann and had failed to show he was the decision maker in the decision not to retain her following her probation.

Canzano appeals.

## *DISCUSSION*

*Standard of Review.*

In reviewing the sufficiency of a complaint against a demurrer, all material facts properly pleaded are admitted, "but not contentions, deductions or conclusions of fact or law." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318; *Page v. Superior Court* (1995) 31 Cal.App.4th 1206, 1208.) "If the material facts show the plaintiff is entitled to any relief, the complaint will be held sufficient." (*Ibid.*) "We give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318.) As we noted in *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 604, "[T]he question of plaintiffs' ability to prove these allegations, or the possible difficulty in making such proof, does not concern the reviewing court."

*Applicable Law.*

The Fair Employment and Housing Act (FEHA) declares it an "unlawful employment practice" for any employer "because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, or sexual orientation of any person, . . . to discharge the person from employment . . . , or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." (Gov. Code, § 12940, subd. (a).) The statute also prohibits employers from retaliating against employees for engaging in protected activity—i.e., for "discharg[ing], expel[ling], or otherwise discriminat[ing] against any person because the person has opposed any practices forbidden under this part . . . ." (*Id.*, Gov. Code, § 12940, subd. (h).)

Courts have observed that proof of intentional discrimination or retaliation often depends on circumstantial evidence because it consists of "subjective matters only the employer can directly know, i.e., his attitude toward the plaintiff and his reasons for taking a particular adverse action." (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 713 (*Mamou*).) "Given the resulting difficulties of proof, the courts have fashioned a special presumption shifting the burden of production—but not persuasion—to the employer upon a prescribed showing by the plaintiff. Specifically, "the employee 'may raise a presumption of discrimination by presenting a "prima facie case," the components of which vary with the nature of the claim, but typically require evidence that "(1) [the plaintiff] was a member of a protected class [or engaged in a protected activity], (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory [or retaliatory] motive. [Citations.]" (*Guz* [*v. Bechtel National, Inc.* (2000)] 24 Cal.4th [317,] 355 [100 Cal. Rptr. 2d 352, 8 P.3d 1089].) A satisfactory showing to this effect gives rise to a presumption of discrimination which, if unanswered

9

by the employer, is mandatory—it requires judgment for the plaintiff. (*Ibid.*)'" (*Mamou*, *supra*, at pp. 713–714.)

"Such evidence, however, only satisfies the plaintiff's initial burden. "'Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ""'drops out of the picture,""' and the burden shifts back to the employee to prove intentional retaliation. [Citation.]' (*Yanowitz* [v. *L'Oreal USA, Inc.* (2005)] 36 Cal.4th [1028,] 1042 [32 Cal. Rptr. 3d 436, 116 P.3d 1123].)" [Citation.]" (*Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1219-1220.)

The City again says Oschmann's "stray remarks" were insufficient to satisfy Canzano's burden to show he or, more importantly, the person who decided to terminate Canzano was motivated by discriminatory animus because of her age or gender. We disagree.

In the summary judgment context, our Supreme Court in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 545, rejected the strict construction of the "stray remarks" doctrine as argued by Google in that case, which the City advances in this one. The "probative value of a challenged remark depends on the facts of each case." (*Id.* at p. 545.) Indeed, as the *Reid* court observed, "the stray marks doctrine contains a major flaw because discriminatory remarks by a nondecisionmaking employee *can* influence a decision maker. 'If [the formal decision maker] acted as the conduit of [an employee's] prejudice—his cat's paw—the innocence of [the decision maker] would not spare the [defendant employer] from liability.'" (*Id.* at p. 542, citation omitted.)

Canzano alleged that before she was assigned to work with Oschmann as her training officer, she had earned 24 satisfactory biweekly performance reviews and was promoted to the next level at which reviews were provided monthly. At the time Oschmann sought to extend her probationary period, at least one other supervisor reviewed her file and noted there was nothing negative in her file justifying such a

10

demotion. When the supervisor (Tamura) obtained Canzano's reinstatement, she alleged, Oschmann later fabricated an negative performance review with no basis in fact. (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 224 [pretext may be demonstrated by showing "'the proffered reason had no basis in fact, the proffered reason did not actually motivate the discharge, or, the proffered reason was insufficient to motivate the discharge. [Citation.]' [Citation.]"]; see also *Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 [pretext may be shown by "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."'"].)

By Canzano's description, not only did Oschmann refuse to train her because of her age and gender and instead took negative action against her, but he constantly stated she was to too old to be a police officer, said she never should have left her prior job, expressed dismay at how she could have held supervisory positions in the Army and at the DWP and made numerous derogatory remarks based on her gender and age. Canzano alleged Oschmann was her supervisor and had a pivotal role in the decision to terminate her considering his alleged responsibility for preventing Canzano from obtaining necessary supervisory signatures in the Blue Book and his lie about the circumstances of the subsequent arrest and tasering of the chase suspect, calling into question whether the remarks even qualify as stray remarks. (*Reid v. Google, supra,* 50 Cal.4th at p. 542.) Here, at the pleading stage, Canzano has alleged sufficient facts to withstand the City's demurrer and the action was erroneously dismissed.

In addition, although she concededly did not request leave to amend in the trial court or show how she could amend her complaint to state claims for harassment and retaliation in violation of FEHA in the trial court, she has done so in her appellate briefing, citing her allegations Oschmann was constantly making statements and demonstrating by his conduct his animosity toward Canzano because of her age and

11

gender on a sufficiently severe and pervasive basis to constitute a hostile work environment, and when she complained about Oschmann's discriminatory and harassing conduct and sought help from the City (within the LAPD), she was ultimately terminated in retaliation for her complaints (Gov. Code, § 12940, subd. (h)).  (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [appellate court will reverse for abuse of discretion if it determines there is a reasonable possibility the pleading can be cured by amendment].)  When a demurrer is sustained without leave to amend, the request for leave to amend may be made for the first time on appeal from the order sustaining the demurrer.  (Code Civ. Proc., § 472c, subd. (a); *City of Stockton v Superior Court* (2007) 42 Cal.4th 730, 746-747 ["The issue of leave to amend is always open on appeal even if not raised by the plaintiff"].)

### *DISPOSITION*

The order of dismissal and order sustaining the City's demurrer to Canzano's first amended complaint are reversed, and the matter is remanded to the trial court with instructions to enter a new order overruling the City's demurrer and allowing Canzano to file an amended complaint.  Canzano is to recover her costs on appeal.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**                                **ZELON, J.**

12